STATE OF CONNECTICUT *v.* ALISON BARLOW
(AC 18583)

Foti, Schaller and Daly, Js.

Argued December 6, 2001—officially released June 4, 2002

*Lori Welch-Rubin*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John J. Davenport*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Alison Barlow, appeals from the judgment of conviction, rendered following a jury trial, of criminal attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2)[1] and 53a-54a,[2] conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[3] and 53a-54a, two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[4] and alteration of a firearm identifi-

---

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[4] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

cation number in violation of General Statutes § 29-36.[5] On appeal, the defendant claims that (1) the trial court improperly denied his motion for a judgment of acquittal, in which he alleged that the evidence was insufficient to support the jury's verdict of guilty as to each of the charges, (2) the court improperly denied his motion to suppress certain evidence and (3) the presentence investigation was conducted in a manner that deprived him of his due process rights at sentencing.[6]

The jury reasonably could have found the following facts. At approximately noon and again at 4 p.m. on January 9, 1997, Kyle Dunn and his friend, Amy Ditota, rented Ditota's purple and black Geo Tracker vehicle to three men, the defendant and two others known as Miquel and Goolie, in exchange for narcotics. The men returned the vehicle at approximately 7:30 p.m. the same day. At approximately 7:15 p.m. on January 9, 1997, the Waterbury police responded to a reported shooting in front of a grocery store on Willow Street.

[5] General Statutes § 29-36 provides: "(a) No person shall remove, deface, alter or obliterate the name of any maker or model or any maker's number or other mark of identification on any firearm as defined in section 53a-3. The possession of any firearm upon which any identifying mark, number or name has been removed, defaced, altered or obliterated shall be prima facie evidence that the person owning or in possession of such firearm has removed, defaced, altered or obliterated the same.

"(b) Any person who violates any provision of this section shall be fined not more than one thousand dollars or imprisoned not more than five years or both and any firearm found in the possession of any person in violation of said provision shall be forfeited."

[6] We note that the defendant cites neither the federal nor the Connecticut constitution in support of this claim, and we assume he makes his claim under both. "The due process clauses of the United States constitution, § 1, of the fourteenth amendment, and of the Connecticut constitution, article first, § 8, can be treated together because they generally have the same meaning and impose similar constitutional limitations. . . . The defendant proffers no argument for enhanced state constitutional protection and, on the facts of this case, we see no reason independently to perform such an analysis." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 197 Conn. 67, 76 n.6, 495 A.2d 1054 (1985).

Upon their arrival, the police located one victim, Naomi Williams, who was found on the ground bleeding in the doorway of the store.[7] The police later located a second victim, Joel Mercado, at Waterbury Hospital.[8] According to the victims, the shots were fired from a purple and black "Jeep-like" vehicle containing three individuals, although neither victim could identify the assailants. During a subsequent search of the scene, detectives found thirteen shell casings. The shell casings were of two different types of ammunition; ten were .22 caliber and three were ten millimeter. The police recovered no bullets at the scene. The police did not identify any of the bullets that injured the victims by their type, nor did the state present any bullets as evidence at trial.

Henry Mercado, Joel Mercado's brother, was not with his brother at the time of the shooting, but they were together earlier in the day and saw the purple and black vehicle pass them several times. He identified the three individuals whom he saw in the vehicle at that time as "Miguel, Poncho[9] and Goolie" and stated that Miguel Torres, an acquaintance from school, was the driver of the vehicle.

On January 10, 1997, Mark Butler, a police lieutenant, and three members of the Waterbury police department went to the Fairmount Projects in Waterbury to investigate the defendant's connection with the shooting. Two police officers arrived at the home of Demetrice Chapman, with whom the defendant had fathered a daughter, and spoke with her for about five minutes. Chapman

[7] The surgeon who treated Williams' injuries described them as life threatening. Williams suffered a bullet wound to her right leg, which led to profuse bleeding and multiple surgeries to repair the femoral artery.

[8] Mercado was shot in the buttocks and ran to a friend's house immediately after the shooting. The friend and his parents then transported Mercado to Waterbury Hospital. Mercado's injuries were not life threatening, and he was released the next day. The bullet was removed at a later date.

[9] Dunn later identified "Poncho" as the defendant.

apprised the police that the defendant owned a blue Thunderbird vehicle that he kept in a nearby parking lot. While the police interviewed Chapman, two other officers approached the rear exit of the home. There they encountered the defendant approaching the home carrying a car battery. During a patdown search of the defendant, the detectives found a set of keys, which they later determined fit the blue Thunderbird. The police arrested the defendant on charges unrelated to the present appeal.

After leaving the Chapman residence, James Nardozzi, a police detective, and other police officers went to a residence to interview Dunn regarding the shooting. Dunn agreed to give a statement and did so at the police station. He apprised the police that he had seen the defendant with a ten millimeter gun and that the gun was a "project," meaning that "whoever needs it, gets it."

The police obtained a search warrant for the Thunderbird at approximately 10:30 p.m. on January 10, 1997. At that time, the car was located on Lestor Drive near Chapman's residence. At some point between 6:08 p.m., January 10, and early January 11, the car was towed to the police station garage. In the early morning hours of January 11, the police searched the vehicle at the police station garage. During the search, they seized a ten millimeter Colt pistol with its serial number obliterated and one round in its chamber. They also seized a magazine containing one round of ammunition, later determined to belong to that weapon, and one round of ten millimeter ammunition found under the front passenger seat. Investigators later determined that the three ten millimeter shell casings found at the scene of the shooting were from this pistol, while the ten .22 caliber shell casings were from a different weapon.

Additional facts will be set forth as necessary to resolve the claims raised on appeal.

## I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal. Specifically, the defendant argues that "the state has failed to prove the essential elements of the crimes charged beyond a reasonable doubt because the circumstantial evidence adduced at trial does not preclude the very reasonable hypotheses: (1) that the victims were actually shot by the gun which threw off the .22 caliber shell casings, which reasonable conclusion requires the reversal of the defendant's two assault in the first degree charges; (2) that, because others clearly had equal access to the ten millimeter gun found in the 1986 Blue Thunderbird, there is insufficient evidence to establish the identity of the shooter and that individual who defaced the identification mark on the handgun, thus the remaining convictions . . . must be reversed as well."

"The standard of appellate review of a denial of a motion for a judgment of acquittal [challenging the sufficiency of the evidence] has been settled by judicial decision. . . . The issue to be determined is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt. . . . The facts and the reasonable inferences stemming from the facts must be given a construction most favorable to sustaining the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 59 Conn. App. 771, 776–77, 758 A.2d 400 (2000), rev'd on other grounds, 258 Conn. 1, 778 A.2d 186 (2001). We also note that "[t]here is no distinction between direct and circumstantial evidence so far as probative force is concerned . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Heinz*, 193 Conn. 612, 625,

480 A.2d 452 (1984); 1 B. Holden & J. Daly, Connecticut Evidence (2d Ed. 1988) § 7c, p. 10.

## A

The defendant argues that the state failed to establish beyond a reasonable doubt the identity element of the crimes with which he was charged. Specifically, he argues that no one identified him as either the passenger or the driver of the black and purple vehicle, nor did the state present any evidence as to the type of bullets that injured the victims. He further challenges the sufficiency of the identification evidence because others had access to the weapon in the Thunderbird. Consequently, he argues that the evidence did not preclude the reasonable hypotheses that the victims were actually shot by the gun that fired the .22 caliber shell casings and that another person could have been the shooter. We disagree.

To secure a conviction for assault in the first degree under § 59a-59 (a) (1), the state must "[establish] beyond a reasonable doubt: (1) the defendant intended to cause serious physical injury to another person; (2) he in fact caused serious physical injury to that person; and (3) he caused that injury by means of a dangerous instrument." *State* v. *Prat,* 66 Conn. App. 91, 95, 784 A.2d 367 (2001).

"Where, as here, the identification of the defendant is derived from circumstantial evidence, it is, nonetheless, the cumulative impact of a multitude of factors that must be examined to determine whether the identification of the defendant has been satisfactorily established by circumstantial evidence. . . . In criminal cases, including the most serious ones, the fact that an accused was the person who committed the criminal act may be proved by circumstantial evidence. . . .

"The jury's sole province as the trier of fact is to draw all reasonable and logical inferences from the

facts as it finds them to exist. . . . The issue of the identification of the accused as the perpetrator of the crime is peculiarly one of fact to be resolved by the jury. . . . If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Rivera*, 32 Conn. App. 193, 201–202, 628 A.2d 996, cert. denied, 227 Conn. 920, 632 A.2d 698 (1993).

Initially, we note, as does the defendant, that the question is not whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence, but rather whether there is a reasonable view of the evidence that supports the trier of fact's verdict of guilty. See *State* v. *Torres*, 242 Conn. 485, 490, 698 A.2d 898 (1997). The state argues on appeal that its burden of proof was simply to show that the defendant used a "deadly weapon," defined by General Statutes § 53a-3 (6) as "any weapon . . . from which a shot may be discharged . . . ." The state argues that it did not need to prove beyond a reasonable doubt that the actual weapon that the defendant used was the ten millimeter gun, rather than the .22 caliber weapon. While we agree with this statement, we note that the evidence was sufficient to establish beyond a reasonable doubt that the defendant did in fact use the ten millimeter weapon in the shooting.

The jury reasonably could have found the following additional facts relevant to our resolution of this claim. The defendant had a motive to kill individuals who had tried to kill him previously. Chapman testified that the defendant stated that they should not drive in the area of the shooting because the defendant "said he had problems there." At approximately 7:30 p.m. on the night of the shooting when the defendant returned the vehicle to Dunn, the defendant told him that they "had

problems" and "that someone tried to kill them" while they were gone. Dunn recounted further that the defendant stated that "[t]hey got into a beef and did what they had to do" and that "[the defendant] went and solved his problems." Chapman also testified that upon returning to her house, the defendant stated that "we got them, we got them. They tried to bust me." When viewed in the light most favorable to sustaining the verdict, this evidence supports the inference that the defendant took responsibility for taking part in the shooting.

Henry Mercado and Joel Mercado saw the defendant, Miguel Torres and Goolie driving a black and purple Jeep vehicle on Willow Street on the day of the shooting. Dunn testified that he rented a black and purple Jeep vehicle to the defendant and two others at 4 p.m., that they returned it at 7:30 p.m., and that upon returning the vehicle the defendant said that they had been driving on Willow Street "when people were falling on the ground." From this evidence, the jury could have inferred that the defendant, Miguel and Goolie were in a black and purple Jeep vehicle in the area of the shooting at approximately 7 p.m. on the night of the shooting and that Joel Mercado and Williams were shot and fell to ground at that time.

Finally, the defendant possessed the ten millimeter pistol that was used during the shooting of the victims. The jury reasonably could have found this based on the fact that when the police arrested the defendant, on the day after the shooting, he was carrying a battery from his car and that this car was later determined to contain the ten millimeter weapon used in the shooting. Additionally, Chapman testified that the defendant did not go to work on January 9 or 10, 1997, and that she told the defendant when others used the Thunderbird while he was at work. When asked by the state's attorney whether she saw anybody else on those days at

his Thunderbird, Chapman testified that she could not recall. Further, Dunn testified that he had seen the defendant in possession of the weapon prior to the shooting. The state also introduced evidence, obtained from a confidential informant, that the defendant kept a gun in the Thunderbird.

In addition to the evidence noted previously, we also agree with the state that the defendant's access to the Thunderbird, later determined to contain a gun used in the shooting, at a time immediately surrounding the shooting is probative of his identity as the shooter. See *State* v. *Gray*, 221 Conn. 713, 722 n.2, 607 A.2d 391, cert. denied, 506 U.S. 872, 113 S. Ct. 207, 121 L. Ed. 2d 148 (1992).

On the basis of our review of the evidence, and construing the evidence, as we must, in a light most favorable to sustaining the jury's verdict, we conclude that the jury reasonably could have concluded, from the facts established and the reasonable inferences drawn therefrom, that the cumulative effect was to establish the defendant's identity as the shooter beyond a reasonable doubt.

## B

The defendant also challenges the sufficiency of the evidence as to his conviction of criminal attempt to commit murder, conspiracy to commit murder and alteration of a firearm identification number. The defendant again argues that his conviction as to these crimes must be reversed because, in his view, the evidence is insufficient to support the identification element of each crime. The defendant asserts that because others had access to the ten millimeter weapon found in his blue Thunderbird, the identification evidence was insufficient as to the remaining charges as well. On the basis of the evidence discussed previously, we conclude that its cumulative effect was sufficient to prove beyond a

reasonable doubt the identification element for these crimes. With respect to the alteration charge, we refer to § 29-36 (a), which provides in relevant part that possession of a weapon on which the identification mark has been altered or obliterated is "prima facie" evidence that the person in possession of the weapon altered or obliterated the identification number. Further, "§ 29-36 does not, by its language, limit application of the inference to situations in which the accused is in actual possession of a pistol. See *State* v. *Alfonso*, 3 Conn. App. 225, 226–27, 486 A.2d 1136 (1985) (defendant convicted under § 29-36 where altered gun found in cinder block windowsill of second floor of building)." *State* v. *Francis*, 246 Conn. 339, 356 n.18, 717 A.2d 696 (1998). Accordingly, we conclude that the court did not improperly deny the defendant's motion for a judgment of acquittal as to the other charges.

With regard to the defendant's conviction of all the charges, aside from the identification challenge, the defendant has failed to provide any other grounds or alternative analysis for our review of his claim. Accordingly, we decline to review this claim further.

II

The defendant next claims that the court improperly denied his motion to suppress the evidence recovered from the Thunderbird as the fruit of an illegal search and seizure. We disagree.

The following facts are necessary for our resolution of this claim. The police obtained the information they used in their application for the search warrant at different times and from several sources during the course of their investigation. Howard Jones, a police detective, spoke to Henry Mercado at the police station during the evening of January 9, 1997. As noted previously, on January 10, 1997, Nardozzi and other officers spoke with Chapman, who told them that the defendant owned

a blue Ford Thunderbird. She told them that the defendant kept the vehicle in a parking lot near to her residence. At approximately 7:30 p.m. on January 10, 1997, Jones took a statement from Chapman at the police station. On the basis of the information supplied by Henry Mercado and Chapman, Jones and another detective applied for and obtained a search warrant for the blue Ford Thunderbird at approximately 10:30 p.m. on January 10, 1997. Nardozzi testified that he had no personal knowledge of when the vehicle was towed. Nardozzi testified that the vehicle was towed from Lestor Drive, on the side facing Brook Side Road, about 100 to 200 feet away from Chapman's residence.

Defense counsel subpoenaed the police records pertaining to when the vehicle was towed. The police did not produce the records, and the trial was suspended in order to locate the records. When trial resumed, Sergeant Edward Daponete of the Waterbury police department testified that the car might have been towed because it was impeding traffic.[10] At some point between 6:08 p.m. on January 10, when the police initiated a motor vehicle investigation and the early morning of January 11, 1997, a towing company towed the vehi-

---

[10] "[Assistant State's Attorney]: Now, Sergeant Daponete . . . what specific part of that record was the subject of the subpoena for today?

"[Daponete]: The '86 Ford Thunderbird.

"[Assistant State's Attorney]: You're referring to state's exhibit, the search by make of vehicle?

"[Daponete]: Yes.

"[Assistant State's Attorney]: And is such a car listed on that form?

"[Daponete]: Yes, sir. It's the fourth vehicle down.

"[Assistant State's Attorney]: What does that computer printout indicate to you?

"[Daponete]: It indicates to [me] that a 1986 Ford Thunderbird with Connecticut registration 219 GAJ was towed by Williamson's Auto by the detective bureau. And it was given a complaint number, which is an internal number for our department. It's for record tracking.

"[Assistant State's Attorney]: Does it indicate on there what is the purpose of the tow?

"[Daponete]: I think the tow at the time was impeding traffic."

cle from the lot near Chapman's residence to the police garage. Neither party adduced evidence as to the precise time that the vehicle was towed. The police executed the search warrant on the vehicle between 6 a.m. and 8 a.m. on January 11, 1997.

The defendant moved to suppress the evidence obtained by the police as a result of their seizure of the blue Thunderbird because he believed it was seized at approximately 6:08 p.m., prior to the issuance of the warrant.[11] The court denied the motion, concluding that "[it had] no evidence that there was any seizure or search of this vehicle except after the warrant was signed by Judge Doherty, and, therefore, the motion to suppress is accordingly denied."[12]

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection

---

[11] The specific grounds alleged in the motion to suppress were: (1) "That said search and seizure was illegal in that said warrant [was] insufficient on its face" and (2) "[t]here was not probable cause for believing the existence of the grounds on which the warrant was issued."

The transcript of the hearing on the motion makes clear that the defendant was concerned specifically with the timing of the seizure.

[12] The court's signed transcript states in relevant part: "Well, there is no problem whatsoever with the warrant. The court adopts those three positions taken by the state. With regard to the positions on the law, including evidence that is a car that would inevitably would have been discovered and contents discovered, I don't find any time discrepancies at all here. State's number two, first document in time according to Sergeant Daponete says that there was a motor vehicle investigation of this car around, on January 10, 1997, 6:08 p.m., has nothing to do with when it was towed or anything else. He said that was done first. Later on, the untimed document notes that it was towed.

"So, there is no time discrepancy there. [And] I would say the warrant is perfect, besides what is there, that warrant, the defendant's connection to the car is pretty clear. An ongoing investigation, he was in proximity to the car and in fact he was holding the car battery. And his girlfriend said it was his car. Other information gleaned from what other people said, he doesn't carry guns with him, leaves them in other places.

"Based upon all of that, this court has no evidence that there was any seizure or search of this vehicle except after the warrant was signed by Judge Doherty, and, therefore, the motion to suppress is accordingly denied."

with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. . . . Because a trial court's determination of the validity of a . . . [seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Vivo*, 241 Conn. 665, 674–75, 697 A.2d 1130 (1997).

The state argues that the defendant on appeal does not contest probable cause for the warrant. Rather, the defendant concentrates on the alleged illegality of the seizure. Specifically, he argues that "[b]ecause the seizure of the car was initiated before the warrant was signed . . . the validity of the warrant is moot." "Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Copeland*, 205 Conn. 201, 209, 530 A.2d 603 (1987). In attacking the legality of the seizure, the defendant concentrates his argument solely on the timing of the seizure. Therefore, we will limit our review to an analysis of the court's conclusions relating to the timing of the seizure of the vehicle.

At the suppression hearing, the court determined that the vehicle was not seized prior to the issuance of the search warrant at approximately 10 p.m. on January 10, 1997. This determination is a finding of fact and will not be overturned unless it is clearly erroneous. See *State* v. *Greenfield*, 228 Conn. 62, 68, 634 A.2d 879 (1993)

(trial court's conclusion that defendant had not been seized any time prior to his formal arrest was finding of fact subject to clearly erroneous standard of review).

The court noted that while Daponete testified that records showed that the vehicle was involved in a motor vehicle investigation at 6:08 p.m. on January 10, 1997, the information adduced at trial did not establish when the vehicle was towed. The defendant argues that the state conceded that the vehicle was towed prior to the issuance of the warrant and that the facts[13] surrounding the seizure establish that the seizure was executed illegally. The state responds, however, that it simply assumed the illegality of the search to make an alternate argument for admitting the evidence seized from the blue Thunderbird and denying the motion to suppress in the event that the court held that the seizure was illegal.[14] The defendant's assertion as to this concession is without merit.

During the hearing, the court heard testimony concerning the procedures followed by the police department when arranging for towing seized vehicles, as well as testimony concerning the police records of the tow in the present case. Daponete testified that the police incident report indicated that the investigation began at 6:08 p.m. on January 10, 1997. A separate document indicated the make and model of the vehicle but did not contain a reference to time.

Jones testified as to the application for the warrant, as well as the timing of the seizure. During cross-exami-

[13] The defendant argues that because the vehicle was parked in a parking lot, it could not have been blocking traffic. The defendant also asserts that a car towed for parking violations is taken to the towing agency until a fine is paid, not to a police department garage. The defendant offered no evidence to support his allegations concerning this aspect of police towing procedures.

[14] At trial, the state argued that the inevitable search doctrine would be applicable to remove the taint from the hypothetically illegal seizure. On appeal, the state argues that the doctrine of independent source constituted a second ground for affirming the trial court's ruling on the motion to suppress.

nation, defense counsel and Jones engaged in the following colloquy:

"[Defense Counsel]: And by your best recollection, you believe [Judge Doherty signed the warrant] on or about 10 p.m. on January 10th?

"[Jones]: That's correct.

"[Defense Counsel]: You believe the execution of the warrant was done by Detective Nardozzi?

"[Jones]: That's correct.

"[Defense Counsel]: It was subsequent to that period of time whatever that time may be on or about ten o'clock p.m. that the car was then towed to the station?

"[Jones]: I believe so."

Later during the suppression hearing, Nardozzi also testified as to the timing of the tow:

"[Assistant State's Attorney]: Did there come a time when [the blue Thunderbird] was towed?

"[Nardozzi]: Yes.

"[Assistant State's Attorney]: Do you know when that was?

"[Nardozzi]: Sometime during the *late night,* of the 10th.

"[Assistant State's Attorney]: Did you play any role in having that car towed?

"[Nardozzi]: No, I did not.

"[Assistant State's Attorney]: Do you have any personal knowledge about whether the time relationship between the warrant that you executed was prepared and when the car was towed?

"[Nardozzi]: No, I did not." (Emphasis added.)

In sum, the court did not hear any affirmative evidence that the vehicle was towed prior to the issuance of the warrant, whereas it heard testimony from at least one member of the Waterbury police familiar with the investigation that the vehicle was towed after the issuance of the warrant.

The court's ruling on the motion specifically addressed the lack of evidence to support the defendant's argument that the vehicle was towed prior to police obtaining the search warrant. As noted previously, the defendant is incorrect in assuming that the state conceded as much in the course of offering alternate arguments. Moreover, evidence showed that the traffic investigation started at 6:08 p.m. on January 10, 1997, that this fact does not establish when the vehicle was towed and that there are no other records available that do indicate when the vehicle was towed. Finally, the court heard from at least one witness who testified that the vehicle was towed after the police obtained the warrant, i.e., after 10:30 p.m. on January 10, 1997.

On the basis of the evidence before the court at the suppression hearing, its conclusion that there was no problem with the timing of the warrant and the seizure of the blue Thunderbird was not clearly erroneous. After our careful examination of the record, we further conclude that the court's decision to deny the motion to suppress was legally and logically correct and was supported by substantial evidence.

III

The defendant claims finally that the presentence investigation that was conducted by the office of adult probation was inadequate, thus violating his due process rights under the federal constitution. Specifically, the defendant argues that the presentence investigation was conducted in "an expedited fashion that failed

properly to permit development of those elements necessary for the trial court to impose [a] fair sentence."

The defendant concedes that he did not preserve this claim for appeal. Practice Book § 60-5 provides in relevant part that "[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." We also note that the defendant did not seek review of his claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant nevertheless raises plain error in his reply brief, arguing that his defense counsel "alert[ed] the trial court to the error now claimed . . . ."

We reject the defendant's request for plain error review. First, "[p]lain error is properly reserved for those extraordinary situations where the error is so obvious that the fairness and integrity of and public confidence in the judicial process would be impaired were we to fail to address an issue that was not raised or preserved at trial." (Internal quotation marks omitted.) *Dubois* v. *General Dynamics Corp.*, 222 Conn. 62, 69, 607 A.2d 431 (1992). Second, "[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48 n.42, 717 A.2d 77 (1998).

The judgment is affirmed.

In this opinion the other judges concurred.