ANNE M. BIJUR *v.* PETER I. BIJUR
(AC 22428)

Foti, Schaller and Mihalakos, Js.

---

Argued December 4, 2002—officially released October 7, 2003

*Andrew P. Nemiroff*, with whom, on the brief, was *Eric R. Posmantier*, for the appellant (defendant).

*Samuel V. Schoonmaker III*, with whom was *Samuel V. Schoonmaker IV*, for the appellee (plaintiff).

SCHALLER, J. The defendant, Peter I. Bijur, appeals from the judgment of the trial court issuing certain postjudgment orders sought by the plaintiff, Anne M. Bijur, in her postjudgment motion for contempt and order.[1] On appeal, the defendant claims that the court improperly ordered him to resume making alimony payments on the basis of a misinterpretation of the language in article IV[2] of the parties' separation agreement

[1] We note that although the plaintiff's September 13, 2001 motion was labeled a motion for contempt, the plaintiff should have labeled the motion a motion for contempt and for order. Despite the inaccurate label, the court properly considered the substance of relief sought in the subject motion, which requested, in addition to an order for contempt, postjudgment orders for payment of an arrearage, attorney's fees and costs. See *Drahan* v. *Board of Education*, 42 Conn. App. 480, 489, 680 A.2d 316 (when case requires court to determine nature of pleading, court not required to accept precise label affixed to that pleading), cert. denied, 239 Conn. 921, 682 A.2d 1000 (1996). Because the court did not make a finding of contempt, we recognize that the defendant specifically appealed from the granting of the underlying relief sought in the plaintiff's motion for order.

[2] Article IV of the parties' separation agreement states in relevant part:

"4.1 The HUSBAND shall pay to the WIFE, during his lifetime, until her death or his 'retirement date' from Texaco, whichever event shall first occur, as alimony and separate maintenance payments, the following:

"a. Beginning on the first of the month following the date of the dissolution of the parties' marriage . . . per month, payable on the first of the month, in advance;

"b. Beginning after the date of execution of this Agreement, additional alimony of . . . of any cash bonus from HUSBAND's employment at Texaco [Inc.] received by HUSBAND, up to a maximum bonus of . . . annually. WIFE's maximum alimony from the provisions of this Paragraph 4.1.b. shall be . . . annually. Additional alimony payments shall be made to WIFE immediately upon the receipt by HUSBAND of such bonus, if any. HUSBAND's cash bonus shall include any cash bonus amounts available to HUSBAND but which he voluntarily defers.

"c. The HUSBAND's 'retirement date' from Texaco for purposes of this Paragraph 4.1 shall be defined as the date HUSBAND ceases to be an employee of Texaco and becomes eligible to receive benefits in the Texaco retirement plans, subject to the plan provisions as to benefit commencement dates.

"4.2 The alimony provided for in this Agreement shall be non-modifiable as to both term and amount by either party.

"4.3 All payments made to the WIFE pursuant to this Article IV shall be

(agreement). In the alternative, the defendant claims that even if the court properly interpreted the language of article IV, a retirement plan distribution was made to him and, therefore, the court should have found that he had reached his "retirement date" and no longer was required to make alimony payments pursuant to article IV of the agreement. Finally, the defendant claims that a determination by this court that he was in fact retired under the agreement mandates a disgorgement of an alleged overpayment of alimony. We affirm in part and reverse in part the judgment of the trial court.

On February 23, 2000, the court dissolved the marriage of the parties and incorporated into the judgment the provisions of the parties' February 23, 2000 agreement. From the date of dissolution through February, 2001, the defendant paid periodic alimony to the plaintiff.

The defendant retired from his position at Texaco, Inc. (Texaco), on February 4, 2001. At that time, the defendant became eligible to receive retirement benefits and considered himself "retired," as that term is used within the parties' agreement.[3] Consequently, the defendant ceased making periodic alimony payments after February 4, 2001.

On or about August 14, 2001, the defendant filed a motion for an order postjudgment seeking to have the

deductible by the HUSBAND from his income, and shall be included by the WIFE in her income for tax purposes in the year in which payment is made by the HUSBAND. The HUSBAND shall furnish to WIFE a statement of the alimony to be deducted by him on his tax returns within a reasonable time after the end of each calendar year. If WIFE does not object, in writing, within thirty days, to HUSBAND's statement of alimony, it shall be presumed that such amount as reported by HUSBAND to WIFE shall be the alimony amount reported on both parties' respective income tax returns."

[3] The Texaco retirement pension plans include the following: Texaco retirement plan; Texaco supplemental pension plan; Texaco supplemental bonus retirement plan; Texaco employee's thrift plan; and Texaco director and employee referral plan.

plaintiff return to him an alleged periodic alimony over-payment. On or about September 13, 2001, the plaintiff filed a postjudgment motion for contempt and for orders,[4] claiming that the defendant had failed to comply with the agreement by not providing alimony payments for the period of March through August, 2001.[5] A hearing on the two motions was held on October 1, 2001, at which time both parties testified.

The court issued its memorandum of decision regarding the plaintiff's motion on October 5, 2001, in which it determined that the defendant had failed to satisfy the requirements for retirement eligibility pursuant to the agreement. The court ordered the defendant to resume payments of alimony, to pay the accumulated arrears of periodic alimony within thirty days and to pay the plaintiff for legal expenses and disbursements.

The defendant, on October 29, 2001, filed a motion for an articulation of the court's order, arguing that the court had not issued its decision on his motion for order postjudgment. On November 13, 2001, the court issued its memorandum of decision regarding the defendant's motion for articulation, in which the court denied the defendant's motion for order and adopted its reasoning from its October 5, 2001 memorandum of decision.[6] The defendant appealed.

[4] See footnote 1.

[5] In her motion, the plaintiff specifically requested that the court (1) find the defendant in contempt of court, (2) fix an arrearage for the months of March through August, 2001, (3) fix an arrearage pursuant to paragraph 4.1 b of the agreement and (4) order the defendant to pay her attorney's fees and costs.

[6] In its memorandum of decision, the court noted that it decided the defendant's motion for order after deciding the plaintiff's motion. The court also noted that the findings, reasoning and conclusions stated in its October 5, 2001 memorandum of decision, regarding the plaintiff's motion, were incorporated as the basis for denying the defendant's motion for order. Because the October 5, 2001 memorandum of decision ordered the defendant to resume making alimony payments, the defendant's motion for a refund of alimony was denied.

I

The defendant claims that the court improperly granted the plaintiff's postjudgment motion for order and improperly ordered him to resume making alimony payments on the basis of a misinterpretation of the language in article IV of the agreement.

The following additional facts are relevant to the defendant's claim. Article IV of the agreement concerns the defendant's obligation to pay periodic alimony to the plaintiff. Article IV, paragraph 4.1, provides that the defendant's obligation to pay alimony expires upon the defendant's death, the plaintiff's death or the defendant's "retirement date." The agreement defines the term "retirement date" within paragraph 4.1 c as "the date HUSBAND ceases to be an employee of Texaco and becomes eligible to receive benefits in the Texaco retirement plans, subject to the plan provisions as to benefit commencement dates."

In its memorandum of decision, the court found that the defendant had retired from Texaco on February 4, 2001. The court also found that on February 4, 2001, the defendant became eligible to receive benefits in the Texaco retirement plans.

Concluding that the defendant had failed to satisfy the definition of "retirement date" under the agreement, the court focused its attention on article IV, paragraphs 4.1 and 4.1 c. With respect to the phrase "subject to the plan provisions as to benefit commencement dates," which is contained in paragraph 4.1 c, the court interpreted the phrase to mean that the "retirement date" shall be set when the defendant "shall have disbursements made to him from the plans." The court determined that actual retirement disbursements had not yet been made. Consequently, the court concluded that the defendant had failed to satisfy the retirement date requirements, and, therefore, was not retired. Having

concluded that the defendant was not retired within the meaning of the agreement, the court also concluded that the defendant wrongfully had withheld alimony payments. The court did not, however, find the defendant in contempt because his failure to pay was not a wilful violation of a court order.[7]

We must first set forth the appropriate standard of review.[8] "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Prial* v. *Prial*, 67 Conn. App. 7, 9–10, 787 A.2d 50 (2001).

In the present case, the agreement was incorporated by reference into the dissolution decree. "In a marriage dissolution action, an agreement of the parties executed at the time of the dissolution and incorporated into the judgment is a contract of the parties." (Internal quotation marks omitted.) *Sullivan* v. *Sullivan*, 66 Conn. App. 501, 504, 784 A.2d 1047 (2001). The defendant's claim, therefore, involves the interpretation of a contract.

"A contract is to be construed as a whole and all relevant provisions will be considered together. . . . In giving meaning to the terms of a contract, we have said that a contract must be construed to effectuate

[7] Specifically, the court stated that it did not find the defendant in contempt because of the "resourceful but unsuccessful arguments advanced by his counsel."

[8] Because the court did not find the defendant in contempt, for purposes of our review, we are limited to reviewing the granting of the plaintiff's motion to compel resulting in postjudgment orders seeking the payment of an arrearage, attorney's fees and costs.

the intent of the contracting parties. . . . In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish. . . . The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. . . . This is so where the parties have their agreement in writing. . . . In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (Citations omitted; internal quotation marks omitted.) *Barnard* v. *Barnard*, 214 Conn. 99, 109–10, 570 A.2d 690 (1990).

"The interpretation of a contract term that is not so clear as to render its interpretation a matter of law is a question of fact, subject to the clearly erroneous standard of review. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citations omitted; internal quotation

marks omitted.) *Larson* v. *Jacobson,* 38 Conn. App. 186, 189, 659 A.2d 753 (1995).

To identify and to apply the appropriate standard of review, we must, therefore, initially determine whether the agreement, specifically article IV, was unambiguous. A word is ambiguous when it is "capable of being interpreted by reasonably well-informed persons in either of two or more senses." (Internal quotation marks omitted.) *Federal Aviation Administration* v. *Administrator,* 196 Conn. 546, 554, 494 A.2d 564 (1985). Ambiguous also means "unclear or uncertain . . . . [or] that which is susceptible of more than one interpretation" or understood in more ways than one. (Citation omitted; internal quotation marks omitted.) *Lopinto* v. *Haines,* 185 Conn. 527, 538, 441 A.2d 151 (1981).

The subject provision is ambiguous because it is subject to two reasonable interpretations. The defendant argues that paragraph 4.1 c hinges on only two elements, retirement and eligibility, and that the "subject to" language merely indicates that eligibility is subject to internal Texaco retirement plan requirements. In support of his argument, the defendant identifies three additional agreement provisions that also incorporate similar "subject to" language.[9] On the basis of his reading of those provisions in light of the subject paragraph, the defendant argues that the "subject to" language is used

[9] Article III, paragraph 3.1 C, of the agreement states in relevant part: "Henceforth WIFE shall solely control all investment and distribution decisions with respect to her segregated accounts, subject to the provisions of the Supplemental I Thrift Plan and the Deferred Compensation Plan. . . ."

Article III, paragraph 3.2 D, of the agreement states in relevant part: "WIFE shall be entitled to elect the manner in which she shall receive her distributions from such plans, subject to the provisions of the respective plans. . . ."

Article III, paragraph 3.2 D, of the agreement states in relevant part: "To the extent permitted under the relevant plan, WIFE's beneficiary (or estate) shall also have the right to exercise any stock options which she beneficially owns, subject to the provisions of the respective plans."

only to alert the parties to the fact that nothing in the agreement is intended to vary or to alter any retirement plan requirement.

On the other hand, the plaintiff argues that paragraph 4.1 c requires the same two elements, plus the element of distribution, and that the "subject to" language ensures that she receives an uninterrupted stream of income after the defendant retires. That is, although the defendant retired, she is assured of income in the form of alimony payments until he receives retirement distributions. At that point, the plaintiff argues, the alimony payments would end because she would be receiving a stream of income in the form of retirement benefits.

Both parties offer reasonable interpretations of the provision. The fact that paragraph 4.1 c can be interpreted reasonably in two equally compelling ways is evidence that the provision is inherently ambiguous. See *Coscina* v. *Coscina*, 24 Conn. App. 190, 193–94, 587 A.2d 159 (1991).

Because we have determined that the relevant contract language is ambiguous, "[t]he determination of the intent of the parties to a contract . . . is a question of fact subject to review under the clearly erroneous standard." (Internal quotation marks omitted.) *Rund* v. *Melillo*, 63 Conn. App. 216, 221, 772 A.2d 774 (2001). This court has stated frequently that "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . While conducting our review, we properly afford the court's findings a great deal of deference because it is in the unique [position] to view the evidence presented in a totality of circumstances, i.e., including its observa-

tions of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Internal quotation marks omitted.) *Tulisano* v. *Schonberger*, 74 Conn. App. 101, 105, 810 A.2d 806 (2002). Having thoroughly reviewed the briefs, record and transcripts, we conclude that the court's determination was not clearly erroneous.

The language of the subject provision does not explicitly indicate that to satisfy the agreement's definition of "retirement date," Texaco had to distribute retirement benefits to the defendant. The court, concluding that the distribution of benefits was a prerequisite to satisfying the definition of "retirement date," therefore, must have determined that the provision was ambiguous. Yet, the court stated that "[w]hen the language is clear and unambiguous, it is to be given effect according to its terms" and immediately thereafter concluded that the defendant was not retired within the meaning of article IV. That outcome indicates that the court, while determining that the language was clear and unambiguous, inconsistently treated it as if it were ambiguous. The defendant correctly points out that this analysis was improper. That inconsistent treatment alone does not, however, make the court's conclusion clearly erroneous because the decision was both legally and factually supported by the record.

In its memorandum of decision, the court gave meaning to the phrase "subject to plan provisions as to benefit commencement dates." Although the court did not explicitly state as such, it could have reached the decision it did only by determining that the "subject to" language modified the phrase "eligible to receive." In other words, the court neither considered nor treated the "subject to" language as superfluous. "The law of contract interpretation militates against interpreting a contract in a way that renders a provision superflu-

ous."[10] *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 674, 791 A.2d 546 (2002). Although the defendant cites to three additional occurrences of the "subject to" language in the agreement, absent from those specific occurrences are the words "as to benefit commencement dates." The defendant himself states that he was eligible to receive pension benefits from Texaco on February 4, 2001, but added that although he is eligible, "[t]he benefits are *subject to* the provisions of the plan . . . and they are paid under the plan in January of the year after [an employee] retire[s]." By his own statements, the defendant gives meaning to the phrase "as to benefit commencement dates."

On the basis of a review of the facts, the court's conclusion that the parties' use of the subject phrase was intended to require a distribution of plan benefits was not clearly erroneous, and, therefore, not an abuse of discretion.

II

The defendant claims that even if the court properly interpreted article IV, it improperly ordered him to resume making alimony payments in light of the fact that he received a retirement plan distribution on March 1, 2001. More specifically, the defendant argues that when he rolled moneys over from Texaco retirement plan number 020136 into an individual retirement account (IRA), that act constituted a retirement distribution. In response, the plaintiff argues that (1) the agreement requires distribution from all retirement plan benefits,[11] and (2) because the court did not articulate

---

[10] We recognize that ignoring the "subject to" language does not render meaningless all of article IV. It does, however, render almost meaningless, nearly a third of paragraph 4.1 c.

[11] Although the plaintiff argues that the agreement required distributions from "all" of the defendant's retirement plans, the specific language of the agreement states that he is only required to be "eligible to receive benefits in the Texaco retirement plans." It does not, as the plaintiff argues, explicitly require eligibility in *all* of the plans.

whether the IRA rollover was characterized as a distribution, it was incumbent on the defendant to seek further articulation from the court.[12] We agree with the defendant that the IRA rollover satisfied the disbursement requirement of paragraph 4.1 c.

The following additional facts are relevant to the defendant's claim. On March 1, 2001, the defendant received a lump sum payment from the Vanguard Fiduciary Trust Company (Vanguard) in reference to Texaco retirement plan number 020136. The defendant rolled the entire distribution over into an IRA.

We note that the underlying facts as found by the court are subject to the clearly erroneous standard of review. Whether the moneys received by the defendant from Texaco retirement plan number 020136, however, constituted a distribution under paragraph 4.1 c is a question of law. Mixed questions of fact and law call for plenary review. *Bortner* v. *Woodbridge*, 250 Conn. 241, 263–64, 736 A.2d 104 (1999)..

During the hearing on the motions, the court listened to testimony from the defendant indicating that he had received a distribution from his retirement plans held at Vanguard. Moreover, the defendant introduced, as exhibits, Vanguard confirmation of assets transfers and benefit elections forms. On the basis of that evidence and the court's memorandum of decision, it is clear that to reach its decision, the court had to conclude that the moneys used in the IRA rollover transaction did not constitute a retirement distribution.

"A 'retirement distribution' is an amount distributed under an individual retirement plan or under a qualified employer plan. See [26 U.S.C. § 402 (a)]." *Powell* v. *C.I.R.*, 129 F.3d 321, 323 (4th Cir. 1997). Funds paid out

---

[12] We conclude that the court held that the moneys used in the IRA rollover were not retirement distributions and, therefore, the defendant did not need to file a motion for articulation.

of a qualified retirement plan "to a 'distributee' must be included in the distributee's gross income for that year. [26 U.S.C. §] 402 (a). Although neither the [Internal Revenue] Code nor the applicable Treasury Regulations define the term 'distributee' as that term is used in section 402 (a) (1), the general rule is that the 'distributee' of funds from a [qualified retirement] plan is the participant or beneficiary who is entitled to receive the distribution under the terms of the plan. See *Darby* v. *Commissioner*, [97 T.C. 51, 58 (1991)]." *Hawkins* v. *C.I.R.*, 86 F.3d 982, 987 (10th Cir. 1996). "In order to avoid the tax bite of a plan distribution, the distributee may 'roll over' the amount of the distribution into another eligible plan within sixty days. 26 U.S.C. § 402 (a) [(1)-(3)]." *Hawkins* v. *C.I.R.*, supra, 985 n.1.

An IRA is "a savings account in which a person may deposit up to a stipulated amount each year with the deposits deductible from taxable income and both deposits and interest taxable after the person's retirement." Merriam-Webster's Collegiate Dictionary (10th Ed. 1999). "In general, IRAs allow persons to deduct limited contributions to their IRA . . . and defer recognition of gains accruing to the IRA until its distribution." (Citations omitted.) *In re Dubroff* v. *First National Bank of Glens Falls*, 119 F.3d 75, 77 (2d Cir. 1997); see also 26 U.S.C. § 408. "As its name implies, a 'rollover' is [a] . . . tax-deferred method of moving [qualified retirement plan] assets from one [qualified retirement] plan to another or to an IRA." *Frank* v. *Aaronson*, 120 F.3d 10, 12 (2d Cir. 1997). An IRA rollover of a lump sum payment from a retirement plan does not, therefore, inherently change the original classification of those moneys to a nonretirement distribution. See *Boggs* v. *Boggs*, 520 U.S. 833, 836, 117 S. Ct. 1754, 138 L. Ed. 2d 45 (1997) (benefits from employment retirement plans, rolled over into IRA characterized as retirement distribution). The money used in the rollover came from an

employee retirement plan. Therefore, because an IRA rollover does not change the nature of the funds, the money is, as a matter of law, a retirement distribution.

Consequently, we conclude that the court improperly concluded that the moneys used in the IRA rollover were not retirement distributions.

### III

Finally, the defendant claims that the court improperly denied the relief requested, repayment of the alleged overpayment, in his motion for order. Specifically, he argues that if this court determines that he complied with the requirements of article IV, then his payment of periodic alimony for the month of his retirement should be disgorged from the plaintiff on a per day, pro rated basis for the part of the month following his retirement. We disagree.

"It is well settled that in a dissolution of marriage action, the distribution of assets rests within the sound discretion of the court . . . ." *Olson* v. *Olson*, 71 Conn. App. 826, 832, 804 A.2d 851 (2002). To conclude that the court abused its discretion by refusing to order the plaintiff to refund the money, we must determine whether the court either incorrectly applied the law or could not reasonably have concluded as it did. See *Clark* v. *Clark*, 66 Conn. App. 657, 668, 785 A.2d 1162, cert. denied, 259 Conn. 901, 789 A.2d 990 (2001).

Periodic alimony is a type of permanent alimony paid at scheduled intervals. The purpose of periodic alimony is primarily to continue the duty to support the recipient spouse. *Grosso* v. *Grosso*, 59 Conn. App. 628, 631, 758 A.2d 367, cert. denied, 254 Conn. 938, 761 A.2d 761 (2000). "[T]he right to enforce each periodic payment *accrues* on each payment as it *matures*." (Emphasis added.) 24A Am. Jur. 2d, Divorce and Separation § 754

(1998). The periodic alimony payment matures when it becomes due.

According to article IV, paragraph 4.1 a, the defendant was required to pay the plaintiff alimony each month "[b]eginning on the first of the month following the date of the dissolution of the parties' marriage . . . payable on the first of the month, in advance . . . ." In other words, the alimony for the month of February accrued and matured on February 1, 2001. It does not, as the defendant argues, accrue on a day-to-day basis for the month of February. Moreover, because we determined in part II that the termination of the defendant's alimony obligation did not occur until March 1 upon the disbursement of retirement proceeds, even if we were to accept the defendant's per diem theory of accrual, his obligation for February would not be affected. Accordingly, the court's denial of the defendant's requested relief was not an abuse of discretion.

The judgment is reversed only insofar as it orders the defendant to resume alimony payments and to pay the accumulated arrears of periodic alimony payments and those orders are vacated. In all other respects, the judgment is affirmed.

In this opinion the other judges concurred.