CARL S. FEEN *v.* NEW ENGLAND BENEFIT
COMPANIES, INC., ET AL.
(AC 23903)

West, McLachlan and Peters, Js.

Argued December 5, 2003—officially released March 2, 2004

*Wesley W. Horton*, with whom were *Daniel J. Krisch*, *Timothy P. Pothin* and, on the brief, *Marisa A. Bellair* and *Barbara Ellis*, legal intern, for the appellant (named defendant).

*Ira B. Grudberg*, with whom was *Alinor C. Sterling*, for the appellee (plaintiff).

McLACHLAN, J. In this breach of contract action, the defendant New England Benefit Companies, Inc.,[1] appeals from the judgment of the trial court awarding the plaintiff, Carl S. Feen, $371,400.09 in damages. At issue is the court's construction of two oral contracts governing the payment of commissions to the plaintiff for two joint marketing ventures undertaken with the defendant. On appeal, the defendant claims that the court (1) improperly concluded that one contract remained in force after the occurrence of an event that the defendant contends terminated the contract and (2) misconstrued the commission structure of the other contract. We affirm the judgment of the trial court.

This appeal arises out of a business relationship between the plaintiff, an insurance broker, and the defendant, a Rhode Island corporation specializing in administering and marketing group insurance policies to professional organizations. The purpose of the relationship was for the plaintiff to assist the defendant, through its principal, Samuel H. Fleet, in marketing group life, medical and disability insurance plans to two organizations: The Connecticut Bar Association (bar association) and the Connecticut State Dental Association (dental association). It was Fleet's hope that the plaintiff, who purportedly had established good relations with both organizations, would be pivotal to the success of those marketing efforts.

Beginning in the summer of 1993, Fleet and the plaintiff met several times to discuss their marketing plans and eventually reached an oral agreement that, in exchange for the plaintiff's assistance in procuring a

---

[1] Although Samuel H. Fleet, a principal of New England Benefit Companies, Inc., originally was named as a defendant, the action was withdrawn as to him. We therefore refer in this opinion to New England Benefit Companies, Inc., as the defendant.

group insurance contract with the bar association, the defendant would pay the plaintiff a percentage of its total annual commission income. In January, 1994, the bar association accepted the defendant's offer, and the defendant began administering group insurance plans for the bar association's membership, underwritten by Homelife Financial Assurance Corporation (Homelife).[2]

Shortly thereafter, the parties discussed a similar arrangement for the plaintiff to assist the defendant in marketing a group insurance plan to the dental association. The parties again reached an oral agreement that if the defendant secured the dental association's group insurance business, the plaintiff would receive a share of the commissions. In late 1994, the dental association accepted the defendant's offer for a three year contract, and the defendant began administering group insurance plans for the dental association's membership.

Although initially the relationship between the parties was amicable, it turned acrimonious when, in early 1996, the defendant substituted CNA Insurance Company (CNA) for Homelife as underwriter for the bar association policies and, thereafter, stopped making commission payments to the plaintiff. At approximately the same time, the defendant also stopped making commission payments to the plaintiff for the dental association policies, having paid the plaintiff only for the first year of the contract.

On April 18, 2001, the plaintiff brought a two count complaint against the defendant for its alleged breach of the two oral contracts governing the payment of commissions related to the bar association and dental association insurance contracts. At trial, Fleet and the plaintiff provided conflicting testimony as to the terms of the commission agreements. As to the bar association

---

[2] Although Homelife was later purchased by and merged with another insurer, we refer in this opinion to the original underwriter as Homelife.

contract, they both testified that they had agreed that the plaintiff would receive one-third of the defendant's total annual commission on the policies and that the defendant would keep the remaining two-thirds. The principal area of disagreement between the parties concerned whether their commission splitting agreement would continue if the defendant replaced the underwriter for the bar association policies. The plaintiff testified that the agreement would continue on a one-third-two-thirds basis even if the defendant replaced the initial underwriter. Fleet, in turn, testified that he and the plaintiff had agreed to negotiate a new commission splitting agreement if the bar association policies were underwritten through a new carrier. Fleet expressly denied ever telling the plaintiff that their arrangement would continue for as long as the defendant provided group insurance services to the bar association, regardless of the underwriter.

With respect to the dental association contract, the plaintiff testified that he and Fleet had agreed that the plaintiff would receive 1 percent of the defendant's total annual commission in the first year of the contract and 2 percent in years two and three of the contract. Fleet, in contrast, testified that the agreement called for the plaintiff to receive 1 percent in the first year, 0.5 percent in the second year and nothing in the third year.[3]

After hearing those conflicting versions of the contracts, the court credited the plaintiff's testimony over that of Fleet in virtually every respect. The court found that the parties had agreed that the commission payments would continue for as long as the defendant administered policies to the bar association membership, regardless of whether the initial underwriter was replaced. As to the dental association contract, the

---

[3] Also testifying at trial was Peter Buchetto, a dental association representative, whose testimony essentially mirrored that of Fleet.

court found that the commission structure agreed to by the parties called for payments of 1 percent, 2 percent and 2 percent, respectively, for the three years of the contract. Consequently, the court awarded the plaintiff damages in the amount of $371,400.09.[4] This appeal followed.

I

The defendant first claims that the court improperly construed the duration of the bar association contract as continuing after the replacement of Homelife, the initial underwriter, with CNA and, consequently, awarded excessive damages. We decline to review that claim.

The defendant predicates its claim on the contention that the oral contract at issue was a personal services contract, terminable at the will of either party, and that its replacement of Homelife in 1996 was an act sufficient to terminate the contract. The defendant argues, therefore, that the court's damages award was excessive to the extent that it included damages that occurred past early 1996.[5]

Because the defendant failed to raise that issue before the trial court, the claim was not preserved for appellate review. "[I]t is the appellant's responsibility to present such a claim clearly to the trial court so that the trial court may consider it and, if it is meritorious, take appropriate action. . . . For us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Citation omitted;

---

[4] The court awarded the plaintiff damages of $105,756.76 for the defendant's breach of the bar association contract and $265,643.33 for its breach of the dental association contract.

[5] Because, at the time of trial, the defendant still administered the bar association's policies, the court calculated damages to and including the time of trial.

internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 265, 828 A.2d 64 (2003). "A plaintiff cannot try his case on one theory and appeal on another." *McNamara* v. *New Britain*, 137 Conn. 616, 618, 79 A.2d 819 (1951).[6] We accordingly conclude that the issue was not properly preserved for appellate review.

Although we ordinarily limit our review on appeal to issues that were distinctly raised at trial and ruled on by the court, we can nevertheless consider unpreserved claims under the rubric of plain error, as the defendant urges. For the two reasons we will set forth, we decline to do so.

First, the defendant requests such review for the first time in his reply brief. "It is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48 n.42, 717 A.2d 77 (1998). That principle has routinely been applied to requests to review an unpreserved claim pursuant to the plain error doctrine. See, e.g., *Daniels* v. *Alander*, 75 Conn. App. 864, 882–83, 818 A.2d 106, cert. granted on other grounds, 264 Conn. 901, 823 A.2d 1219 (2003); *State* v. *Barlow*, 70 Conn. App. 232, 249, 797 A.2d 605, cert. denied, 261 Conn. 929, 806 A.2d 1067 (2002). We accordingly do not review the defendant's claim.

Second, even if the defendant had requested plain error review in its principal brief, we remain unconvinced that such review is warranted. As we have often reiterated, plain error review "is reserved for truly

---

[6] Although the defendant argues that this claim was not raised at the trial level because it would have been inconsistent with the facts alleged, the defendant does not address how this obviates the concerns underlying the preservation doctrine, namely, that by failing to raise this argument before the trial court, the defendant effectively tied the court's hands and denied it the opportunity to contemplate or to apply the legal theories advanced.

extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Holmes*, 78 Conn. App. 479, 484, 827 A.2d 751, cert. denied, 266 Conn. 909, 832 A.2d 73 (2003). We are not persuaded that the claim presents the type of extraordinary situation for which such review is reserved. In both its principal and reply briefs, the defendant characterizes its claim as one that hinges on a facet of contract law that, while alluded to in dicta in a case more than a half century old,[7] has yet to be squarely addressed by our courts.

Confronted, as we allegedly are here, with a claim contingent on unsettled legal principles, we must decline to afford plain error review for the simple reason that such claim does not implicate an error that "is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) Id. Indeed, plain error review is more appropriately applied to unambiguous instances of impropriety; for instance, where the trial court has failed to apply a clearly relevant statute to a case. See *State* v. *Thornton*, 55 Conn. App. 28, 32, 739 A.2d 271 (1999). We accordingly decline to review the claim.

II

The defendant next claims that the court improperly construed the annual commission percentages owed the plaintiff under the dental association contract. Specifically, the defendant claims that the evidence on the commission structure adduced at trial established that the plaintiff was entitled only to 1 percent in the first year, 0.5 percent in the second year and nothing in the third year. We disagree.

---

[7] See *Burkle* v. *Superflow Manufacturing Co.*, 137 Conn. 488, 78 A.2d 698 (1951).

As that claim is predicated on the court's construction of an ambiguous oral contract term, it is reviewed under the clearly erroneous standard. See *Bijur* v. *Bijur*, 79 Conn. App. 752, 759, 831 A.2d 824 (2003). We therefore do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached but, rather, focus on whether the conclusion reached was legally correct and factually supported. See id.

As noted previously, the court found that the plaintiff was entitled to commission percentages of 1 percent, 2 percent and 2 percent, respectively, for the three years of the contract. Underlying the court's construction was its assessment of the conflicting testimony offered and the credibility of those by whom it was offered.

The defendant advances several arguments as to why the court's construction was improper. Principal among them is that the court's decision to credit the plaintiff's rendition of the commission structure was unsound because only the plaintiff testified in support of that rendition and, in contrast, Fleet's rendition was supported by both the testimony of Peter Buchetto, a representative of the dental association, and certain documentary evidence introduced at trial. Quite simply, the defendant maintains that the plaintiff's testimony was outweighed by the testimony and evidence introduced by the defendant.

The sheer volume of testimony supporting or purporting to support one version of events is not itself dispositive of the credibility of that version. Indeed, the volume of testimony often has little correlative effect on either the court's assessment of the veracity of the facts testified to or the believability of those testifying. See, e.g., *In re Travis R.*, 80 Conn. App. 777, 785, 838 A.2d 1000 (2004) (concluding that although one version

of events may be supported by more testimony than another version, court may credit either version).

Furthermore, the court specifically stated in its memorandum of decision that it did not find the testimony of either Fleet or Buchetto to be credible. The defendant argues that although the court expressly stated that it doubted Fleet and Buchetto's credibility, it failed to articulate its reasons for doing so. Although the court's reasons for doubting their credibility might have been more clearly articulated,[8] we will not question on appeal the soundness of its assessment. As we have frequently observed, the trial judge has the unique distinction of having personally presided over the trial and, in that capacity, has the opportunity to view the evidence presented in the totality of the circumstances, i.e., scrutinizing the demeanor and conduct of the witnesses. See, e.g., *State* v. *Nguyen*, 253 Conn. 639, 658, 756 A.2d 833 (2000). In recognition of its superior position to evaluate those factors as they coalesce at trial and the disparate ability of a reviewing court to glean such things from the written record, we have held that the trial court is vested with the sole discretion to make credibility assessments and to assign the weight to be given testimony. See id.

Furthermore, the written documentation claimed by the defendant to support its version of the agreement was found by the court to be of similarly dubious credibility. The defendant introduced two letters from Fleet to Buchetto, dated September 2 and 7, 1994, in which the commission splitting agreement was discussed. Both

---

[8] It fairly could be surmised that the court's determination was based on its observation, alluded to elsewhere in its memorandum of decision, that the testimony of both Fleet and Buchetto was riddled with inconsistencies and inexplicable failures of memory.

Also, if the defendant was unclear as to the reasons underlying the court's assessment of their credibility, it could have filed a motion for an articulation, as provided for by Practice Book § 66-5.

letters state that the plaintiff's commission percentages had been reduced to 0.5 percent in the second year and nothing in the third year of the dental association contract. Although those letters may appear to corroborate the version of the agreement advanced by Fleet and Buchetto, the court accorded them little weight. The court found that Fleet's testimony that both letters were "blind copied" to the plaintiff was not credible, particularly when there was no indication on the face of the letters that they had been sent to the plaintiff. Additionally, our review of the record reveals that Fleet earlier had testified in a deposition on November 16, 2000, that the letters were not sent to the plaintiff. When questioned on cross-examination about the inconsistent testimony, Fleet explained that sometime following the deposition, he "suddenly" remembered that the letters had, in fact, been mailed to the plaintiff. The court instead concluded, and we agree, that Fleet unilaterally and without the plaintiff's consent reduced the plaintiff's commissions for years two and three of the contract.

The defendant also asserts that the court's finding as to the structure of the commission agreement was "inherently illogical" because the payments essentially constituted a finder's fee and that, given such purpose, it is illogical for the parties to have intended to increase the plaintiff's fee in the second and third years of that contract. We fail to recognize how increasing the commission payments for the second and third years of the contract is inherently illogical, particularly when the plaintiff offered a plausible explanation for the payment scheme. The plaintiff testified that he had agreed to a reduction of his compensation in the first year because Fleet advised him that the dental association was pressing for concessions in the defendant's proposal and that the reduction would help procure the association's business. We find ample support in the record for the

court's construction of the dental association commission agreement and accordingly conclude that the court's findings were not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.