******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JESSICA BROWN *v.* BRETT BROWN
(AC 42576)

Lavine, Moll and Devlin, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dis-
solved, appealed to this court from the order of the trial court requiring
her to reimburse the defendant a certain prorated portion of unallocated
alimony and child support that she received in the year in which she
remarried. The parties' separation agreement, which had been incorpo-
rated into the dissolution judgment, required the defendant to pay the
plaintiff a specified percentage of his gross annual compensation in any
calendar year, which payments were to terminate on, inter alia, the
plaintiff's remarriage. In the year in which the plaintiff remarried, the
defendant paid the plaintiff 40 percent of bonuses and severance pay-
ments he received from a former employer a few months before her
remarriage. The court granted the defendant's postjudgment motion for
order requesting reimbursement, in which he claimed that, when the
plaintiff remarried in August of a year in which she was entitled to
receive unallocated support, she was only to receive those benefits,
specifically the bonus and severance payments, on a prorated basis. In
the plaintiff's objection to the motion for reimbursement, she claimed
that, because the separation agreement did not contain a provision for
prorating unallocated support, she had no obligation to refund any part
of the unallocated support she received that year. The parties, upon
the plaintiff's remarriage, stipulated to the defendant's monthly child
support obligation, which was entered as an order of the court. The
defendant filed a cross appeal from the trial court's denial of his motion
for modification of child support, in which he claimed that a reduction
in his earned income constituted a substantial change in circumstances
from the date when the court entered the parties' child support stipula-
tion as an order of the court. On the plaintiff's appeal and the defendant's
cross appeal to this court, *held*:

1. The trial court improperly granted the defendant's postjudgment motion
for reimbursement of unallocated support and ordered the plaintiff to
repay the defendant a portion of the unallocated support he paid her in
the year of her remarriage: the relevant portion of the parties' separation
agreement was clear and unambiguous, and the trial court improperly
read a term into the separation agreement when it concluded that it
was implicit that the defendant's gross annual compensation was to be
prorated, the relevant language in the separation agreement did not
contain the word prorated, and, to the contrary, additional language
from the separation agreement provided that the defendant was to make
all payments from his additional and/or incentive compensation to the
plaintiff within fifteen days of receipt of such payment by the defendant,
and no paragraph of the agreement set forth conditions under which
the plaintiff may have been required to return unallocated support at
the time she was entitled to receive it; furthermore, the parties did
not seek to unbundle alimony and child support in the defendant's
unallocated payments at the time the parties stipulated to the defendant's
child support obligation and arrearage, retroactive to the month of the
plaintiff's remarriage, and the fact that there was no mention of an
overpayment at that time did not support the defendant's position that
the parties intended to prorate unallocated support that terminated
before the end of a calendar year.

2. The defendant could not prevail on his claim in his cross appeal that the
trial court improperly denied his motion for modification of child support
by concluding that the reduction in his earned income did not constitute
a substantial change in circumstances: any claim that the court failed
to consider the defendant's argument regarding deviations from child
support guidelines or that the court failed to consider child support
guidelines failed, as at the time that the defendant filed his motion, he
did not plead that the amount of child support he was paying pursuant
to the parties' stipulation deviated from the child support guidelines

but, instead, that he had experienced a substantial change in circumstances due to his loss of earned income, and the court was not required to consider the presumptive child support under the guidelines, as the evidence demonstrated the defendant's ability to maintain his lifestyle, spending habits, travel and assets, and, thus, he failed to carry his burden to demonstrate clearly and definitely that he experienced a substantial change in circumstances notwithstanding his diminution in salary and period of unemployment.

Argued March 2—officially released July 21, 2020

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Schofield, J.*; judgment dissolving the marriage and granting certain other relief; thereafter, the court, *Tindill, J.*, entered the parties' stipulation regarding child support as an order of the court; subsequently, the court, *Heller, J.*, granted the defendant's motion for order requesting reimbursement of unallocated support and denied the defendant's motion to modify child support, and the plaintiff appealed and the defendant cross appealed to this court. *Reversed in part*; *further proceedings*.

*Samuel V. Schoonmaker IV*, with whom, on the brief, were *Wendy Dunne DiChristina* and *Peter M. Bryniczka*, for the appellant-cross appellee (plaintiff).

*Leslie I. Jennings*, for the appellee-cross appellant (defendant).

*Opinion*

LAVINE, J. This appeal concerns the judgment rendered by the trial court when it adjudicated two postdissolution motions filed by the defendant, Brett Brown. The plaintiff, Jessica Brown,[1] appeals from the decision of the court ordering her to reimburse the defendant certain unallocated alimony and child support (unallocated support), claiming that the court misinterpreted the parties' separation agreement. The defendant cross appeals from the court's denial of his motion for modification of child support. We agree with the plaintiff's claim but reject the defendant's claim. We, therefore, reverse that portion of the trial court's judgment with respect to its order to the plaintiff to reimburse the defendant unallocated support and affirm the trial court's judgment with respect to its denial of the defendant's motion to modify child support.

The following procedural history is relevant to our resolution of the parties' appeals. The parties were married in August, 2000, and together had three children, who were minors on February 26, 2013, when the court, *Schofield, J.*, rendered judgment dissolving their marriage.[2] The judgment of dissolution incorporated the parties' separation agreement (agreement) by reference. Paragraph 4.1 of the agreement obligated the defendant to pay the plaintiff unallocated support "during his lifetime, until her death or remarriage, or February 28, 2017, whichever event shall first occur . . . ." The plaintiff remarried on August 8, 2015, automatically terminating the defendant's unallocated support obligation.[3] On October 19, 2015, the plaintiff filed a motion to "fix" child support in accordance with paragraph 5.1 of the agreement, following the termination of unallocated support.[4] On June 20, 2016, the parties stipulated to the defendant's monthly child support obligation, which the court, *Tindill, J.*, entered as an order of the court.[5] In July, 2016, Judge Tindill accepted the parties' stipulation as to the amount of the defendant's child support arrearage, which the defendant paid.[6] See footnote 4 of this opinion.

On October 24, 2016, the defendant filed a motion in which he sought to have the court order the plaintiff to reimburse him for what he claimed was his overpayment of unallocated support in 2015. On January 9, 2017, the defendant filed a motion to modify his child support obligation on the basis of a substantial change in circumstances due to the loss of his employment. The plaintiff opposed both of the defendant's motions. The parties appeared before the court, *Heller, J.*, to argue the defendant's motions on September 11, 2018. On January 30, 2019, the court issued a memorandum of decision in which it granted the defendant's motion for reimbursement of unallocated support and ordered the plaintiff to pay the defendant $81,358.40. The court, however, denied the defendant's motion to modify child

support. The present appeal and the present cross appeal followed.[7]

We begin with the standard of review applicable to postdissolution matters. An appellate court "will not disturb trial court orders unless the trial court abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal facts significant to a domestic relations case. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citations omitted; internal quotation marks omitted.) *Gabriel* v. *Gabriel*, 324 Conn. 324, 336, 152 A.3d 1230 (2016).

I

THE PLAINTIFF'S APPEAL

The plaintiff claims that the court erred by granting the defendant's motion for order, postjudgment, and ordering her to repay the defendant $81,358.40 of the unallocated support he paid her in 2015. The plaintiff claims that the court misinterpreted the agreement, failed to enforce its intended terms, and added terms to the agreement. We agree with the plaintiff and, therefore, reverse in part the judgment of the trial court.

The agreement was incorporated by reference into the February 26, 2013 judgment dissolving the parties' marriage. Article IV of the agreement, titled Unallocated Alimony and Support, required the defendant to pay the plaintiff unallocated support pursuant to certain terms. The relevant paragraphs of article IV follow:

"4.1. Commencing as of the first day of March, 2013, the [defendant] shall pay to the [plaintiff], during his lifetime, until her death or remarriage, or February 28, 2017, whichever event shall first occur, the following percentages of the *'gross annual compensation' as hereinafter defined* in any calendar year.[8] . . . [In a year in which the defendant earned up to $1 million, the plaintiff was entitled to 40 percent of gross annual compensation, not to exceed $400,000.][9]

"4.2. All payments made from the [defendant's] base salary shall be made in cash and in equal monthly installments on the first day of each calendar month, in advance. All payments from the [defendant's] additional and/or incentive compensation *shall be made by the* [*defendant*] *to the* [*plaintiff*] *within fifteen . . . days of receipt* of such payments by the [defendant].

"4.3. (a) *'Gross annual compensation in any year'*

*shall be defined* to include any and all earnings of any nature whatsoever *actually received* by the [defendant] in the form of cash or cash equivalents, or which the [defendant] is entitled to receive, from any and all sources including in relation to the services rendered by the [defendant] by way of his past, current or future employment, including but not limited to salary and bonus . . . .[10]

"(c) The [defendant] shall take no action for the purpose of defeating the [plaintiff's] *timely right to receive alimony* and, in particular, shall take no action to reduce, divert, delay or defer income for the purpose of reducing, limiting or delaying the [defendant's] alimony obligation to the [plaintiff].

"4.4. The alimony payments pursuant to paragraph 4.1 hereof shall be non-modifiable as to duration by the parties or a court of competent jurisdiction and any decree of any court incorporating all or a portion of this [a]greement shall preclude such modification. The alimony payments pursuant to paragraph 4.1 shall otherwise be modifiable pursuant to [General Statutes § 46b-86 (b)].

"4.5. For each year in which the [defendant] is obligated to pay unallocated alimony and support to the [plaintiff], the [defendant] shall provide the [plaintiff] with his year-end [pay stub], W-2s, K-1s and 1099s and a copy of his federal tax return when filed with the taxing authority. In addition, the [defendant] shall provide the [plaintiff] evidence, including pay stub or distribution sheet, *each time he receives* any change in salary or bonus *within seven . . . days of receipt* or filing. In addition, the [defendant] shall provide the [plaintiff] *within seven . . . days* of his receipt, with all statements evidencing the award of restricted share units and stock options and any other deferred or incentive compensation, including but not limited to documentation reflecting when and under what circumstances the restrictions lapse and/or the options may be exercised.

"4.6. In the event the [defendant] changes employment and receives compensation incident thereto, in replacement of deferred or incentive compensation to which the [plaintiff] was entitled to share as income subject to the provisions of this Article IV, she shall be entitled to share in the replacement compensation to the extent she would have shared in the original deferred or incentive compensation.

"4.7. *The* [*defendant*] *shall take no action for the purpose of defeating the* [*plaintiff's*] *timely right to receive unallocated alimony and support* and, in particular, shall take no action to reduce, divert, delay or defer income for the purpose of reducing, limiting or delaying the [defendant's] unallocated alimony and support obligation to the [plaintiff] pursuant to this Article IV." (Emphasis added; footnotes added.)

In its memorandum of decision, the court found that the defendant had requested that it "order the plaintiff to reimburse him for the unallocated alimony and child support that he overpaid in 2015. According to the reconciliation prepared by [the defendant's] prior counsel in August, 2016, the defendant paid the plaintiff $288,309.51 in 2015, but he should have paid her $206,951.11.[11] The difference of $81,358.40 is largely due to the defendant's paying the plaintiff 40 percent of the bonuses and severance payments that he received in March and April, 2015 from RBS and [Jefferies, LLC]. The defendant made these payments a few months before the plaintiff remarried." (Footnote added and footnote omitted.) The court continued that, at oral argument on September 11, 2018, the defendant contended that he had overpaid unallocated support in 2015 because the plaintiff was only entitled to receive 40 percent of his gross annual compensation on a prorated basis (i.e., for seven months, not for the entire year), in view of her remarriage in August, 2015. The plaintiff countered that the agreement did not contain a provision for prorating unallocated support and, therefore, she had no obligation to refund any part of the unallocated support she received in 2015.

The court determined that the defendant's obligation to pay the plaintiff unallocated support terminated when the plaintiff remarried and further determined that, pursuant to paragraph 4.1 of the agreement, "the plaintiff was entitled to receive 40 percent of the defendant's 'gross annual compensation in any year,' as defined in paragraph 4.3 of the [agreement], between $0 and [$1 million]. . . ." Although the court agreed with the plaintiff that nothing in the agreement "states explicitly that the defendant's annual unallocated . . . support obligation should be prorated if it terminated prior to the end of a calendar year," the court found that "[t]here is also nothing in the . . . agreement to suggest that the plaintiff would be entitled to a windfall if she remarried shortly after the defendant paid her 40 percent of his annual bonus, or that the defendant would be entitled to keep 100 percent of his annual bonus if he received it a few weeks after the plaintiff remarried."

As part of its analysis, the court set forth *a portion* of paragraph 4.5 of the agreement that requires the defendant in each year he is obligated to pay unallocated support to provide the plaintiff with his "year-end [pay stub], W-2s, K-1s and 1099s and a copy of his federal tax return . . . ."[12] The court found that, beginning in 2013, and continuing for each year in which he had an unallocated support obligation, the defendant was to provide his year-end tax documents to the plaintiff, including 2015 when his unallocated support obligation terminated in August of that year. The court determined that the defendant would have had to provide

the plaintiff with year-end tax documents in 2017, had his unallocated support obligation continued until February 28, 2017, when his obligation terminated under the terms of the agreement. The court concluded that the plaintiff had a right to review the defendant's tax documents to confirm that she had received the proper percentage of his "gross annual compensation" for that portion of the year, whether it was seven months or two months or twelve months.

The court also stated that "[i]mplicit in paragraph 4.1 is that the defendant's [unallocated support] obligation, which was based on his gross annual compensation, was to be prorated when it terminated prior to December 31. Otherwise there would be no need to review the defendant's year-end tax documents for the year in which the [unallocated support] terminated; the only documents required would be evidence of income received to the date of termination." The court found that "the parties intended that the defendant's [unallocated support] obligation would be prorated if it terminated prior to the end of the year."[13] The court, therefore, granted the defendant's motion and ordered the plaintiff to reimburse the defendant $81,358.40.

Our resolution of the plaintiff's claim turns on our construction of article IV of the agreement. We are guided by the principles of contract construction and the applicable standard of review. "It is well established that a separation agreement that has been incorporated into a dissolution decree and its resulting judgment must be regarded as a contract and construed in accordance with the general principles governing contracts. . . . When construing a contract, we seek to determine the intent of the parties from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Extrinsic evidence is always admissible, however, to explain an ambiguity appearing in the instrument. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . . When the language is clear and unambiguous, however, the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law. . . .

"A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity when ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance differ-

ent interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . .

"In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties." (Internal quotation marks omitted.) *Grogan* v. *Penza*, 194 Conn. App. 72, 78, 220 A.3d 147 (2019). "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Internal quotation marks omitted.) Id., 79. "A word is ambiguous when it is capable of being interpreted by reasonably well-informed persons in either of two or more senses. . . . Ambiguous also means unclear or uncertain . . . [or] that which is susceptible of more than one interpretation or understood in more ways than one." (Citation omitted; internal quotation marks omitted.) *Bijur* v. *Bijur*, 79 Conn. App. 752, 760, 831 A.2d 824 (2003). Importantly, an agreement is not ambiguous because it does not contain a certain provision or is allegedly incomplete. See *Massey* v. *Branford*, 118 Conn. App. 491, 499, 985 A.2d 335 (2009), cert. denied, 295 Conn. 913, 990 A.2d 345 (2010).

"[T]he threshold determination in the construction of a separation agreement . . . is whether, examining the relevant provisions in light of the context of the situation, the provision at issue is clear and unambiguous, which is a question of law over which our review is plenary." (Internal quotation marks omitted.) *Fazio* v. *Fazio*, 162 Conn. App. 236, 244, 131 A.3d 1162, cert. denied, 320 Conn. 922, 132 A.3d 1095 (2016). On the basis of our plenary review of article IV of the agreement, we conclude that it is clear and unambiguous.[14]

In his brief, the defendant argues that "to effectuate the intent of the parties that the plaintiff share in the defendant's 'gross annual compensation,' that entitlement must be read to mean that, in this instance, the plaintiff shall share in 40 [percent] of *all* 'gross annual compensation' received by the defendant in 2015, prorated for the seven out of twelve months of 2015 in which she was entitled to receive [unallocated support] . . . ." (Emphasis added.) We disagree, as paragraph 4.1 does not contain the word *all*. As the plaintiff points out in her reply brief, the term "gross annual compensation in any calendar year" does not include the term prorated.

"Gross annual compensation in any calendar year" is defined in paragraph 4.3 (a) of the agreement and provides, in part, " 'Gross annual compensation in any year' shall be defined to include any and all earnings of any nature *whatsoever actually received by the* [*defendant*] in the form of cash or cash equivalents, or which the [defendant] is entitled to receive, from any and all sources including in relation to the services

rendered by the [defendant] by way of his past, current or future employment, including but not limited to salary and bonus  . . . ." The paragraph defines what types of payments constitute gross annual compensation. It does not provide that gross annual compensation is the sum total of the gross annual compensation that the defendant receives in a year.

Significantly, paragraph 4.3 (a) does not address when the defendant is to pay the plaintiff the relevant percentage of the gross annual compensation he receives. The time in which he is to make unallocated support payments to the plaintiff is set forth in paragraph 4.2, to wit: "All payments made from the [defendant's] base salary shall be made . . . on the first day of each calendar month, in advance. All payments from the [defendant's] additional and/or incentive compensation shall be made by the [defendant] . . . *within fifteen . . . days of receipt of such payment* by the [defendant]." (Emphasis added.)

A "contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . ." (Internal quotation marks omitted.) *Grogan* v. *Penza*, supra, 194 Conn. App. 79.

Pursuant to paragraphs 4.1, 4.2, and 4.3 (a) of the agreement, in the year 2015, the defendant was required to pay unallocated support to the plaintiff from the *gross annual compensation that he actually received* until August 8, 2015, when his unallocated support obligation terminated due to the plaintiff's remarriage. The defendant received bonuses and severance pay, which by definition is gross annual compensation, in March and April, at a time in which he was required to pay the plaintiff 40 percent thereof within *fifteen days*. None of those three paragraphs, or any other paragraph in the agreement, sets forth conditions under which the plaintiff may have been required to return unallocated support that she received at a time she was entitled to receive it.[15]

The case of *Bijur* v. *Bijur*, supra, 79 Conn. App. 752, is instructive. In *Bijur*, the defendant filed a motion seeking reimbursement of alimony he claimed that he had overpaid the plaintiff. The issue in the case centered on the meaning of the word *retirement*. Id., 755. The defendant retired in the sense that he had stopped working on February 4, 2001. Id., 754–55. He paid the plaintiff alimony in February, 2001, but in no month thereafter. The plaintiff filed a motion for contempt in which she alleged that the defendant had failed to pay her alimony pursuant to the terms of the separation agreement, which required the defendant to pay alimony when he retired subject to the distribution of his pension. Id., 756. A subissue in the case was the meaning of pension distribution. The trial court denied the defendant's motion for reimbursement and ordered the defendant to

pay the plaintiff retroactively to the date of his pension distribution, but did not find him to be in contempt. Id. The defendant appealed to this court, claiming that the trial court had misinterpreted the parties' separation agreement with respect to the duration of his alimony obligation. Id., 756–57. This court found that the meaning of *retirement* in the separation agreement was ambiguous and that the parties had offered reasonable but differing interpretations of *that portion of* the agreement. Id., 761. After resolving the distribution question, and therefore the date of the defendant's retirement (March 1); id., 764; this court reversed the trial court's judgment ordering the defendant to pay the plaintiff alimony retroactively to March, but affirmed the trial court's decision denying the defendant's motion for disgorgement from the plaintiff on a per day, prorated basis for the month of February, following the day he stopped working, for the following reasons. Id., 766.

"It is well settled that in a dissolution of marriage action, the distribution of assets rests within the sound discretion of the court . . . . To conclude that the court abused its discretion by refusing to order the plaintiff to refund the money, we must determine whether the court incorrectly applied the law or could not reasonably have concluded as it did. . . .

"Periodic alimony is a type of permanent alimony paid at scheduled intervals. The purpose of periodic alimony is primarily to continue the duty to support the recipient spouse. . . . [T]he right to enforce each periodic payment accrues on each payment as it matures. . . . The periodic alimony payment matures when it becomes due." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 766–67; see also 24A Am. Jur. 2d 121, Divorce and Separation § 666 (2008). The *Bijur* defendant was required to make alimony payments on the first day of the month in advance. Because he paid his February alimony obligation on the first of the month, he was not entitled to a per diem disgorgement for the remainder of the month. *Bijur* v. *Bijur*, supra, 767.

In the present case, paragraph 4.2 required the defendant to pay the plaintiff gross annual compensation in the form of bonuses and severance pay within fifteen days of its receipt. In March and April, 2015, the plaintiff was entitled to receive unallocated support. The defendant was obligated to pay the plaintiff unallocated support from the bonus and severance pay he received in March and April, 2015. His unallocated support payment matured and became due fifteen days after he received each payment. The defendant, therefore, was not entitled to reimbursement for that which he was obligated to pay the plaintiff at the time.

The plaintiff also claims that the court improperly added terms to the agreement when it stated, "[i]mplicit in paragraph 4.1 is that the defendant's unallocated

[support] obligation, which was based on his gross annual compensation, was to be prorated when it terminated prior to December 31." The term *prorated* is not found anywhere in the agreement. "In interpreting a contract courts cannot add new or different terms." (Internal quotation marks omitted.) *Stratford* v. *Winterbottom*, 151 Conn. App. 60, 73, 95 A.3d 538, cert. denied, 314 Conn. 911, 100 A.3d 403 (2014). "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but *what intention is expressed in the language used*." (Emphasis added.) *Ives* v. *Willimantic*, 121 Conn. 408, 411, 185 A. 427 (1936). The agreement contains no provision that the unallocated support was to be prorated if it terminated prior to the end of a calendar year.[16]

An agreement is not ambiguous because it does not contain a provision or is allegedly incomplete. In *Massey* v. *Branford*, supra, 118 Conn. App. 498–99, this court affirmed the judgment of the trial court, which rejected the plaintiffs' claim that the settlement agreement was incomplete because it did not include the name of a nonparty. See also *Kostak* v. *Board of Education*, Superior Court, judicial district of Litchfield, Docket No. CV-86-0043374-S (June 26, 2006) (rejecting plaintiff's claim that settlement agreement was incomplete because certain term was not included in it).

The evidence in the present case indicates that each of the parties has a high net worth and *is* accustomed to sophisticated financial matters. See part II of this opinion. At the time they were divorced, the parties were represented by experienced counsel who specialized in dissolution matters. Had the parties wanted to include a pro rata provision, or a true-up as it is sometimes called, in the agreement, they could have done so. Pro rata and true-up provisions commonly are incorporated in separation agreements. See, e.g., *Grogan* v. *Penza*, supra, 194 Conn. App. 75[17]; *Nadel* v. *Luttinger*, 168 Conn. App. 689, 693, 147 A.3d 1075 (2016).[18] The parties did not include language providing for the unallocated support that the defendant paid the plaintiff to be prorated if the support obligation terminated before December 31. "A court cannot ignore or disregard the language of the agreement because in hindsight an additional or more expansive term would have been better for one of the parties." *Grogan* v. *Penza*, supra, 80; see also *Crews* v. *Crews*, 295 Conn. 153, 169, 989 A.2d 1060 (2010). The court, therefore, improperly read a term into the agreement when it concluded that it was *implicit* that the defendant's gross annual compensation was to be prorated.

Child support and alimony are not delineated in an order of unallocated support. This court has stated, in

the context of a motion for modification of child support, that "[b]ecause an unallocated order incorporates alimony and child support without delineating specific amounts for each component, the unallocated order, along with other financial orders, necessarily includes a portion attributable to child support in an amount sufficient to satisfy the [child support] guidelines. . . . Thus, to decide a motion to modify in this situation, a trial court must determine what part of the original decree constituted modifiable child support and what part constituted nonmodifiable alimony." (Citation omitted; internal quotation marks omitted.) *Malpeso* v. *Malpeso*, 165 Conn. App. 151, 165–66, 138 A.3d 1069 (2016). In other words, before the court may rule on the motion to modify, it must unbundle the unallocated support. Id.

In the present case, the plaintiff's right to unallocated support terminated in August, 2015. In June, 2016, the parties stipulated that the defendant's child support obligation was $4250 per month with step-downs as each one of their children reached the age of majority. A few weeks later, the parties stipulated to the defendant's child support arrearage retroactive to August, 2015. As noted in part II of this opinion, no court determined the defendant's child support obligation at the time of dissolution in 2013, or in June, 2016, when Judge Tindill accepted the parties' child support stipulation. See footnote 20 of this opinion. The fact that the parties did not seek to unbundle alimony and child support in the defendant's unallocated payments at that time is telling. It does not appear that, at the time the parties negotiated the defendant's child support obligation and related arrearage, the defendant claimed an overpayment of unallocated support to offset the arrearage. If the parties had intended to prorate the unallocated support the plaintiff received for only seven months in 2015, any claimed overpayment would have been taken into account and placed on the record. The fact that there was no mention of an overpayment in June or July, 2016, does not support the defendant's position that the parties intended to prorate unallocated support that terminated before the end of a calendar year.

For the foregoing reasons, the judgment of the trial court with respect to the granting of the defendant's motion for order, postjudgment, is reversed and the case is remanded with direction to deny the motion.

## II

### THE DEFENDANT'S CROSS APPEAL

In his cross appeal, the defendant claims that the court improperly denied his motion for modification of child support by concluding that the reduction in his earned income did not constitute a substantial change in circumstances. We disagree.

"[General Statutes §] 46b-86 governs the modification

of [a] child support order after the date of a dissolution judgment. . . . Section 46b-86 (a)[19] permits the court to modify . . . child support orders in two alternative circumstances. Pursuant to this statute, a court may not modify [a] child support order unless there is first either (1) a showing of a substantial change in the circumstances of either party *or* (2) a showing that the final order for child support substantially deviates from the child support guidelines . . . ." (Emphasis added; footnote added and omitted; internal quotation marks omitted.) *De Almeida-Kennedy* v. *Kennedy*, 188 Conn. App. 670, 675–76, 205 A.3d 704 (quoting *Weinstein* v. *Weinstein*, 104 Conn. App. 482, 491–92, 934 A.2d 306 (2007), cert. denied, 285 Conn. 911, 943 A.2d 472 (2008)), cert. denied, 332 Conn. 909, 210 A.3d 566 (2019).

The following additional facts are relevant to our resolution of the defendant's cross appeal. As noted previously in part I of this opinion, the parties stipulated in June, 2016, that from the time his unallocated support obligation terminated in August, 2015, the defendant's child support obligation was $4250 a month, subject to a one-third reduction when each one of the parties' children reached the age of majority. On January 9, 2017, the defendant filed a motion to modify his child support obligation because "he ha[d] been terminated from his employment and no longer ha[d] any earned income." He moved "for an order modifying his child support obligation to an amount that is consistent with the current . . . child support guidelines." The defendant did not plead that the amount of child support that he was paying pursuant to the parties' stipulation deviated from the child support guidelines.

The parties appeared before the court to argue the defendant's motion for modification of child support in September, 2018. The defendant testified at length on both direct and cross-examination regarding his income, employment, and expenses. When ruling on the motion, the court recited the procedural history regarding the defendant's child support obligation, specifically, that paragraph 4.1 of the agreement required the defendant to pay unallocated support to the plaintiff until her remarriage. When the plaintiff remarried on August 8, 2015, the defendant stopped paying her unallocated support. In June, 2016, the parties stipulated to the defendant's child support obligation; the defendant agreed to pay the plaintiff child support in the amount of $4250 per month retroactive to August, 2015.[20] See footnote 21 of this opinion.

In addition, the court found that at the time of the June, 2016 child support stipulation, the defendant was a bond trader employed by Jefferies, LLC, where his annual base salary was $400,000. According to his May 20, 2016 financial affidavit, the defendant's gross base monthly income from employment was $33,333 and his net monthly income from employment was $19,580. His

total monthly income, however, was $28,345, which included his net base monthly employment, interest, dividend, and bonus income. He reported monthly expenses of $38,180. His assets were valued at $10,166,496 and his liabilities at $3600.[21]

The court found that the defendant's employment with Jefferies, LLC, ended in January, 2017, and he was given one month's salary as severance. The defendant was unemployed from that time until August 22, 2017, when he joined Stifel, Nicolaus & Co., Inc. (Stifel), as a bond trader with an annual base salary of $250,000. The defendant's September 11, 2018 financial affidavit indicated a gross monthly salary of $20,833 and a net monthly salary of $12,485. His net average monthly commissions were $151. The defendant estimated his monthly income from interest and dividends to be $5590. His total monthly expenses were $40,420, his assets were valued at $11,044,794, and his liabilities were valued at $4909. Stifel lent the defendant $150,000, a loan forgivable over three years.

With respect to the plaintiff, the court found that she had not worked outside her home since she became pregnant with the parties' eldest child. Her May 18, 2016 financial affidavit reflected an average monthly income of $1648 from interest and dividends. Her monthly expenses were $41,027. She had assets valued at $6,309,279 and no liabilities. The plaintiff's September 6, 2018 financial affidavit reflected a net monthly income from investments of $6296 and monthly rental income of $1458. She reported monthly expenses of $37,697, which included private school tuition for the parties' children that was paid for by the defendant and household expenses that were paid for by her husband.[22]

The court acknowledged the principles of law governing the modification of child support. Section 46-86 (a) governs the modification of a child support order after the date of dissolution and provides in relevant part: "Unless and to the extent that the decree precludes modification . . . any final order for the periodic payment of . . . support . . . may, at any time thereafter, be . . . set aside, altered or modified . . . upon a showing of a substantial change in the circumstances of either party . . . ." See also *Weinstein* v. *Weinstein*, supra, 104 Conn. App. 482. "To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either part to it." *Borkowski* v. *Borkowski*, 228 Conn. 729, 737–38, 638 A.2d 1060 (1994).

The court recognized that under the substantial change in circumstances provision of § 46b-86 (a), "[w]hen presented with a motion for modification, *a court must first determine* whether there has been a substantial change in the financial circumstances of one or both of the parties. . . . Second, if the court

finds a substantial change in circumstances, it may properly consider the motion and . . . make an order for modification. . . . A party moving for a modification of [a support] order must clearly and definitely establish the occurrence of a substantial change in the circumstances of either party that makes the continuation of the prior order unfair and improper. . . . The party seeking modification bears the burden of showing the existence of a substantial change in the circumstances." (Emphasis added; internal quotation marks omitted.) *Light* v. *Grimes*, 156 Conn. App. 53, 65, 111 A.3d 551 (2015); *Fox* v. *Fox*, 152 Conn. App. 611, 621, 99 A.3d 1206, cert. denied, 314 Conn. 945, 103 A.3d 977 (2014) (same). In determining whether there has been a substantial change of circumstances of one or both of the parties, "the trial court is limited to considering events arising after the dissolution decree or the most recent modification thereof." *Olson* v. *Mohammadu*, 310 Conn. 665, 675, 81 A.3d 215 (2013).

"In the context of a trial court's consideration of a motion to modify, *the guidelines become relevant only after a change in circumstances has been shown, if that is the ground urged in support of modification* . . . or in determining whether the existing child support order substantially deviates from the guidelines, if that is the ground urged in support of modification." (Citation omitted; emphasis added.) *Mullin* v. *Mullin*, 28 Conn. App. 632, 635–36, 612 A.2d 796 (1992).

"Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the exiting order." *Borkowski* v. *Borkowski*, supra, 228 Conn. 738. A court's findings on the basis of financial affidavits alone are inadequate to support a modification without any record that the court had evaluated the circumstances surrounding the payer's claimed inability to pay. See *Olson* v. *Mohammadu*, supra, 310 Conn. 676; *Sanchione* v. *Sanchione*, 173 Conn. 397, 407, 378 A.2d 522 (1977).

In the present case, the court determined that June, 2016, was the starting point for its determination as to whether there had been a substantial change in the parties' circumstances when Judge Tindill entered the parties' child support stipulation as an order of the court.[23] Judge Heller examined the evidence presented at the September 11, 2018 hearing to determine whether the defendant clearly and definitely had established that there was a substantial change in circumstances. The court found that in September, 2018, the defendant's financial circumstances had not changed substantially since June, 2016.[24] Significantly, the court found that the defendant was able to maintain his lifestyle even though he had not been employed from January until August, 2017. Although his net monthly base salary had

declined by 36 percent, his assets at the time of the 2018 hearing exceeded $11,000,000 and his monthly expenses and liabilities were essentially unchanged from June, 2016. The court considered the defendant's total financial picture on the basis of the evidence presented and found that he had "failed to establish the threshold requirement of . . . § 46b-86 (a)—he has not shown that a substantial change in his financial circumstances has occurred since the parties entered into the June, 2016 stipulation." The court therefore denied the defendant's motion to modify his child support obligation.

The court found the amounts listed on his financial affidavit, but did not find his total net income for either 2017 or 2018.[25] Neither party requested an articulation for that purpose. See Practice Book § 66-5. The court concluded that the defendant had failed to establish the threshold requirement of § 46b-86 (a) that there had been a substantial change in his financial circumstances since the parties entered into the 2016 child support stipulation and denied the defendant's motion for modification of child support obligation.

On appeal, the defendant claims that the court improperly concluded that his reduction in income did not constitute a substantial change in circumstances because the court improperly (1) considered his assets and expenses when it determined that his significant reduction in income did not constitute a substantial change in circumstances, (2) failed to consider that the decrease in the defendant's income decreased the presumptive child support order by more than 15 percent, (3) considered his income only as of the date of the hearing, rather than at both the time he filed the motion for modification of child support and the date of the hearing on that motion,[26] (4) included other income for purposes of his support obligation, (5) considered as income the return on his capital contribution in an investment, (6) considered the exercise of stock units awarded to him as part of the property division of the parties' assets at the time of dissolution, and (7) imputed a rate of return on his investments that he did not realize.[27] He also claims that with his income at the time he filed the motion for modification of child support and at the time the motion was heard, the decrease in presumptive child support was greater than 15 percent from the most recent order, thereby providing a presumptive substantial change in circumstances.[28]

The plaintiff responded in her brief that the trial court properly found that there had been no substantial change in the defendant's financial circumstances by comparing his September, 2018 financial affidavit with his May, 2016 financial affidavit. The plaintiff acknowledges, as did the trial court, that the defendant had sustained a decline in earned income but contends that the defendant's overall financial situation had not

changed substantially. Although the defendant's base salary was $400,000 in 2016 and had decreased to $250,000 in 2018, in 2016, his assets were valued at $10,166,496 and his liabilities totaled $3600. In 2018, his assets were valued at $11,044,794 and his liabilities at $4909. Even though the defendant had been unemployed from January to August in 2017, his net worth increased by $878,298. In early 2017, he received a deferred cash payment of $1.3 million from RBS, his former employer, and a second deferred payment in 2018. The plaintiff also argued that the court found no evidence that the defendant's lifestyle had changed between June, 2016 and September, 2018. In addition to his earned income, in 2017, he received approximately $66,000 in dividends and interest from his investment portfolio. The plaintiff noted that, according to the defendant's financial affidavits, his expenses were greater than his earned income, indicating that he supported his lifestyle, in part, with returns from his investments.

On the basis of our review of the record, particularly the evidence regarding the defendant's ability to maintain his lifestyle, spending habits, travel, and assets[29]; the briefs of the parties; and their oral arguments, we conclude that the court did not abuse its discretion by denying the defendant's motion for modification because the defendant failed to carry his burden to demonstrate clearly and definitely that there has been a substantial change in circumstances notwithstanding his diminution in salary and period of unemployment.

We acknowledge that the decrease in the defendant's earned income may have created a rebuttable presumption of a greater than 15 percent deviation from the child support guidelines, but neither Judge Tindill nor Judge Heller ever made a finding as to the presumptive child support under the guidelines. In 2016, the defendant agreed to pay child support of $4250 per month without a finding as to the presumptive amount under the guidelines. It is apparent to us from the memorandum of decision that Judge Heller determined that the defendant's overall financial circumstances, which had improved between 2016 and 2018, did not represent a substantial change of circumstances and, therefore, the presumption was rebutted.

First, as a matter of law, we conclude that any claim that the court failed to consider the defendant's argument regarding deviations from the child support guidelines or that the court failed to consider the child support guidelines fails. The basis of the defendant's motion for modification was a substantial change in circumstances due to his loss of earned income, not a deviation from the child support guidelines. The court carefully examined the evidence, including the defendant's testimony regarding his income and spending habits, and the defendant's financial affidavit and deter-

mined that there had not been a substantial change in his financial circumstances. Unless the defendant had demonstrated a substantial change in circumstances, which he did not, there was no need for the court to consider the child support guidelines.[30]

The defendant's claims that the court improperly considered his assets and expenses and included "other income" as requested by the plaintiff when it found that there had been no substantial change in circumstances are without merit. The court did not address the defendant's "other income," whatever it may be. The court found that there was no substantial change in circumstances on the basis of the defendant's lifestyle between 2016 and 2018, which had not changed despite a nearly 40 percent reduction in his base salary and months of unemployment. As to the court's consideration of the source of the defendant's income, the child support guidelines "include bonus and deferred compensation in the definition of gross income. Regs., Conn. State Agencies § 46b-215a-1 (11) (A). A court must consider earned and unearned income from *all sources* in calculating gross income to fashion child support obligations. . . . Id., § 46b-215a-1 (11)." (Emphasis in original; internal quotation marks omitted.) *Hendricks* v. *Haydu*, 160 Conn. App. 103, 117, 124 A.3d 554 (2015). Moreover, questions involving modification of child support depend on conditions as they exist at the time of the hearing. See *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 558, 46 A.3d 112 (2012). "[T]he determination of a parent's child support obligation must account for all of the income that would have been available to support the children had the family remained together." *Jenkins* v. *Jenkins*, 243 Conn. 584, 594, 704 A.2d 231 (1998). Our Supreme Court has stated that it "broadly interprets the definition of gross income contained in the guidelines to include items that, in effect, increase the amount of a parent's income that is available for child support purposes." (Emphasis omitted; internal quotation marks omitted.) *Hendricks* v. *Haydu*, supra, 113; see also *Unkelbach* v. *McNary*, 244 Conn. 350, 360, 710 A.2d 717 (1998). For the foregoing reasons, we conclude that the court did not abuse its discretion when it denied the defendant's motion for modification of child support.

The judgment is reversed with respect to the granting of the defendant's motion for order, postjudgment, for reimbursement of unallocated support and the case is remanded with direction to deny the defendant's motion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff is now known as Jessica Drbul.

[2] The children still were minors at the time the trial court, *Heller, J.,* decided the motions at issue in this appeal.

[3] The plaintiff does not dispute that her right to alimony terminated at the time she remarried. See *Mihalyak* v. *Mihalyak*, 30 Conn. App. 516, 521, 620 A.2d 1327 (1993) (time certain alimony termination provision in dissolution judgment is self-executing).

[4] Article V of the separation agreement is titled "Child Support." Paragraph

5.1 provides: "Upon the termination of the unallocated alimony and child support pursuant to Article IV hereof, the parties shall determine the amount of child support to be paid by the [defendant] during his lifetime to the [plaintiff] for the support of each of the minor children and in the event they are unable to agree, the amount of such child support payments shall be determined by a court of competent jurisdiction. The amount of child support shall be paid retroactive to the date of the termination of the unallocated alimony and support payments."

[5] Nothing in the file indicates that the parties submitted child support guidelines at the June, 2016 hearing or that Judge Tindill made a finding as to the presumptive child support under the guidelines.

[6] At the time the parties stipulated to the defendant's child support arrearage in July, 2016, the defendant did not seek a credit against his child support arrearage on the basis of an overpayment of unallocated support that he paid in 2015.

[7] We recognize that the parties have filed appeals from separate decisions of the trial court that were issued in one memorandum of decision. There is precedent for denominating the appeals as an appeal and a cross appeal. See *Commissioner of Public Health* v. *Freedom of Information Commission*, 311 Conn. 262, 267 n.3, 86 A.3d 1044 (2014).

[8] The agreement contained a chart governing the amount of unallocated support the defendant was to pay the plaintiff in a particular year depending on the amount of gross annual compensation that he received. The chart contained five levels of increasing annual compensation and corresponding reductions in the percentage of that compensation to which the plaintiff was entitled as unallocated support. In other words, as the defendant's compensation increased, the plaintiff's entitled percentage of it decreased.

[9] There is no dispute that the defendant earned less than $1 million in 2015.

[10] Paragraph 4.3 (b) pertains to the defendant's self-employment, if any, and is not implicated in the present appeal.

[11] The defendant represented in his motion for order, postjudgment, that he had "paid the plaintiff $288,309.51 [unallocated support] in calendar year 2015, and claim[ed] that he [had] overpaid the [unallocated support] in the amount of $81,251.91. Pursuant to the following calculations, [he claimed that the] plaintiff should have received $207,057.60 as [unallocated support]:

"2015 Gross Annual Income <u>40 [percent]</u> <u>Multiplied by [0].5833</u>

"$877,440.45          $354,967.18          $207,057.60"

In a footnote in its memorandum of decision, the court noted that "the defendant in his proposed orders ask[ed] that the plaintiff be ordered to reimburse him the sum of $81,251.91. In his memorandum of law re: portion of bonus income paid in 2015 includible in annual alimony calculation[s] . . . the defendant claims that the overpayment of [unallocated support] was $81,240.07."

[12] The remainder of paragraph 4.5 provides: "In addition, the [defendant] shall provide the [plaintiff] evidence, including pay stub or distribution sheet, each time he receives any change in salary or bonus *within seven . . . days of receipt or filing*. In addition, the [defendant] shall provide the [plaintiff] within seven . . . days of his receipt, with all statements evidencing the award of restricted share units and stock options and any other deferred or incentive compensation, including but not limited to documentation reflecting when and under what circumstances the restrictions lapse and/or the options may be exercised." (Emphasis added.)

[13] In support of its determination regarding the parties' intent, the court cited *King* v. *Colville-King*, Superior Court, judicial district of Waterbury, Docket No. FA-08-4018279-S (February 20, 2015), and *Upton* v. *Upton*, Superior Court, judicial district of Fairfield, Docket No. FA-06-4017460-S (May 11, 2007) (clarified in a subsequent memorandum of decision dated February 20, 2008), as situations in which the court prorated alimony payments. Those cases are distinguishable in that they do not concern the construction of a separation agreement but, rather, the manner in which the court resolved payment of alimony from bonuses when events beyond the control of the parties transpired.

In *King* v. *Colville-King*, supra, Superior Court, Docket No. FA-08-4018279-S, the alimony payer's bonuses initially were to be paid monthly as he received them. His employer, however, changed its bonus payment schedule from monthly to annually in the final year in which alimony was to be paid. The court ordered the final bonus payment to be prorated at the end of the year to maintain the integrity of the original judgment. In *Upton*, the trial court failed to include a schedule of alimony payments in its judgment of dissolution. It opened the judgment in February, 2008, to rectify the omission

and issued an order regarding regular payments on the basis of the payer's base pay and a prorated schedule for bonus compensation. *Upton* v. *Upton*, Superior Court, judicial district of Fairfield, Docket No. FA-06-4017460-S (February 20, 2008).

[14] The relevant portion of paragraph 4.1 of the agreement provides: "Commencing as of the first day of March, 2013, the [defendant] shall pay to the [plaintiff] . . . until her . . . remarriage . . . the following percentage of the 'gross annual compensation' as hereinafter defined in any calendar year . . . ." The court misstated this portion of paragraph 4.1 in its memorandum of decision when it wrote that "the plaintiff was entitled to receive 40 percent of the defendant's 'gross annual compensation in any year,' as defined in paragraph 4.3 . . . between $0 and [$1 million] . . . ."

[15] As stated previously, the plaintiff was entitled to receive unallocated support until she remarried. The only factor in the agreement limiting the plaintiff's receipt of unallocated support was a cap of $400,000 in a year in which the defendant received gross annual compensation of $1 million or less. The unallocated support that the defendant paid the plaintiff in 2015, $288,309.51, did not approach the $400,000 cap.

[16] In concluding that prorating was called for, the court relied on the provisions of the agreement requiring the defendant to provide calendar year-end pay stubs and tax documents. The court minimized the significance of the defendant's obligation to provide the plaintiff with evidence of bonus and severance payments within seven days of receipt or a change in his base compensation. Those requirements indicate that the defendant was to apprise the plaintiff of his compensation as he received it. The plaintiff therefore was able to determine whether she was receiving timely payments. The plaintiff also has argued on appeal that the purpose of the defendant's providing year-end tax documents was for recalculation of child support under article V of the agreement. See part II of this opinion.

[17] "The alimony paid by the [plaintiff] to the [defendant] shall be paid in three components (monthly . . . and quarterly payments totaling $160,000 based on the first $550,000 of [the plaintiff's] income, and a year-end [true-up] alimony payment based on gross income of the [plaintiff] between $550,000 and $750,000)." (Internal quotation marks omitted.) *Grogan* v. *Penza*, supra, 194 Conn. App. 75.

[18] "Within [thirty] days after filing of the [defendant's] tax return in which the receipt of the restricted stock units are reflected, the parties shall true-up to share equitably the tax burden on the vesting of the [restricted stock units]." (Internal quotation marks omitted.) *Nadel* v. *Luttinger*, supra, 168 Conn. App. 693.

[19] General Statutes § 46b-86 (a) provides in relevant part: "Unless and to the extent that the decree precludes modification, any final order for the periodic payment of . . . support . . . may, at any time thereafter, be . . . modified by the court upon a showing of a substantial change in the circumstances of either party or upon a showing that the final order for child support substantially deviates from the child support guidelines established pursuant to section 46b-215a, unless there was a specific finding on the record that the application of the guidelines would be inequitable or inappropriate. There shall be a rebuttable presumption that any deviation of less than fifteen per cent from the child support guidelines is not substantial and any deviation of fifteen per cent or more from the guidelines is substantial. . . ."

[20] Paragraph 4 of the June, 2016 stipulation provided that the "defendant's obligation to pay the plaintiff $4250 per month shall be reduced by one-third . . . as each child attains age eighteen, or if a child is still attending high school when he attains age eighteen . . . until a child completes his high school education or attains age nineteen . . . whichever event shall first occur." Paragraph 4 also provided that it "shall be without prejudice to either party's right to file a motion to modify the child support and/or the amount of the automatic reduction." Under paragraph 5 of the stipulation, the defendant acknowledged his obligation under the separation agreement to pay for the children's education, medical insurance, and unreimbursed medical expenses.

[21] In a footnote, Judge Heller stated that there were no child support guidelines worksheets in the file for the June, 2016 hearing. The court further stated that "[c]hild support guidelines worksheets that were prepared by counsel in connection with the June, 2016 stipulation were admitted into evidence as [p]laintiff's [e]xhibits 10 and 11 [at the September 11, 2018 hearing]. Counsel for the defendant also prepared a child support guidelines worksheet for the September 11, 2018 hearing based on the parties' May,

2016 financial affidavits, which was admitted into evidence as [d]efendant's exhibit S. The defendant's presumptive weekly child support obligation range[d] from $690 to $2115 on these child support guidelines worksheets. *Nothing in the court file reflects the court's findings in June, 2016, as to the presumptive weekly child support obligation and any deviation from the guidelines. The parties offered no evidence in that regard during the September 11, 2018 hearing.*" (Emphasis added.)

We have reviewed the record and found no evidence that Judge Tindill unbundled the unallocated support and determined what portion of the unallocated support was designated for child support. See *Malpeso* v. *Malpeso*, supra, 165 Conn. App. 165 (unallocated support orders incorporate alimony and child support without delineating amounts for each; unallocated order necessarily includes portion attributable to child support); see also *Tomlinson* v. *Tomlinson*, 305 Conn. 539, 558, 46 A.3d 112 (2012).

Judge Heller's decision indicates that she did not consider the child support guideline worksheets submitted by the parties when she determined that the defendant had not met his burden to demonstrate that there had been a substantial change in circumstances. Her decision was predicated on the defendant's financial affidavits.

[22] The court noted the plaintiff's testimony that her net monthly rental income may not be accurate on her current financial affidavit and that she may have made an error in her tax calculations.

[23] Both parties submitted child support guideline worksheets at the September, 2018 hearing, but Judge Heller did not indicate which, if either, set of worksheets she relied on in determining that there had been no substantial change in circumstances. In a footnote, the court stated that "[c]hild support guidelines worksheets that were prepared by counsel in connection with the June, 2016 stipulation were admitted into evidence as [p]laintiff's [e]xhibits . . . . Counsel for the defendant also prepared a child support guidelines worksheet for the September 11, 2018 hearing based on the parties' May, 2016 financial affidavits, which was admitted into evidence as [d]efendant's [e]xhibit . . . . The defendant's presumptive weekly child support obligation ranges from $690 to $2115 on these child support guidelines worksheets. Nothing in the court file reflects the court's findings in June, 2016, as to the presumptive weekly child support obligation and any deviation from the guidelines. The parties offered no evidence in that regard during the September 11, 2018 hearing." Judge Heller also made no finding regarding the presumptive child support under the guidelines.

[24] The court did not specifically find the amount of the defendant's total net income in 2017 or earnings to the date of the 2018 hearing. In its memorandum of decision, the court refers to the figures on the defendant's financial affidavits. The court made no finding as to whether it considered the defendant's deferred compensation to be income. The defendant retained his RBS deferred compensation pursuant to the property distribution in the agreement. Neither party filed a motion for articulation seeking clarification of the court's finding.

General Statutes § 46b-82 does not define income. In such instances, we look to the ordinary meaning of the word. See General Statutes § 1-1 (a); see also *Gay* v. *Gay*, 70 Conn. App. 772, 800 A.2d 1231 (2002), aff'd, 266 Conn. 641, 835 A.2d 1 (2003). Income is defined as "a gain or recurrent benefit that is [usually] measured in money and for a given period of time, derived from capital, labor, or a combination of both, includes gains from transactions in capital assets, but excludes unrealized advances in value . . . ." (Internal quotation marks omitted.) *Gay* v. *Gay*, supra, 778.

[25] The court found pursuant to the defendant's September 11, 2018 financial affidavit that he had a gross monthly salary of $20,833 and a net monthly salary of $12,485. He reported gross monthly average commissions of $403, but he testified that his gross monthly average commissions were actually $803. His estimated monthly interest and dividend income is $5590. His total net monthly income is $18,226 according to his current financial affidavit. He reported total monthly expenses of $40,420. His assets are valued at $11,044,794. His liabilities total $4909. He also had a contingent debt to Stifel of $150,000.

[26] A trial court has discretion to modify retroactively child support to different amounts especially during long periods of time while a motion is pending. See *Zahringer* v. *Zahringer*, 124 Conn. App. 672, 689, 6 A.3d 141 (2010). The defendant filed one motion for modification of child support in January, 2017. He did not amend the motion or file another motion for modification of child support when he found new employment in August, 2017. The defendant does not claim that he argued for two modified child

support orders during the September, 2018 hearing. He, however, did file proposed orders in which he proposed that the court determine his presumptive support obligation pursuant to the guidelines for the period of time that he was unemployed, find that he overpaid the plaintiff, and order her to reimburse him for the overpayment. He also proposed that the court determine his presumptive child support obligation pursuant to the guidelines for the time he found new employment to the date of the September, 2018 hearing, find that he overpaid the plaintiff, and order the plaintiff to reimburse him for the overpayment.

The court did not address the defendant's proposed orders in its memorandum of decision. The defendant did not file a motion for articulation, asking the court to articulate whether it had considered his proposal for separate orders for the respective periods of time. It is the appellant's burden to provide an adequate record for review. See *State* v. *Feliciano*, 74 Conn. App. 391, 402, 812 A.2d 141 (2002), cert. denied, 262 Conn. 952, 817 A.2d 110 (2003). "In a situation in which the court has not set forth the factual and legal basis for a discretionary ruling, and the appellant has failed to seek an articulation in accordance with Practice Book § 66-5, we must presume that the court acted correctly and can only conclude that there has been an abuse of discretion if such abuse is apparent on the fact of the record before us." *Bank of New York Mellon* v. *Horsey*, 182 Conn. App. 417, 430, 190 A.3d 105, cert. denied, 330 Conn. 928, 194 A.3d 1195 (2018). Inasmuch as the defendant sought two modification of child support orders on the basis of the child support guidelines in a case in which the court did not find a substantial change in circumstances, we cannot conclude that the court abused its discretion.

[27] In its memorandum of decision, the court did not discuss the defendant's rate of return on his investments. We decline to address the claim further.

[28] The defendant did not allege that the order that entered in June, 2016, deviated from the child support guidelines. The defendant's motion for modification of child support alleged the "[d]efendant represents that he has been terminated from his employment and no longer has any earned income." He requested that the court enter a child support order consistent with the current child support guidelines. At the hearing on September 11, 2018, counsel for the defendant argued that the court should enter a child support order consistent with the income shared model. The defendant did not argue that the rebuttable presumption that a 15 percent difference in the presumptive child support amount applied.

[29] At the hearing on September 11, 2018, the defendant testified as follows in response to questions from the plaintiff's counsel:

"Q.: [W]hen you lost your job in December of 2016, did you do anything to try to reduce your expenses?

"A.: Do anything?

"Q.: Make any changes.

"A.: I mean I—with regard to my boys, I kind of try to keep a lot of the stuff status quo, especially like keeping the [nannies] that were around. I generally thought I was a frugal person by nature. I mean. . . .

"Q.: Okay. So, is it your testimony that there's nothing specific that you can recall you did to try to spend less money even during a period when you weren't working?

"A.: I probably didn't do anything to spend less money.

"Q.: On your financial affidavit, your current one . . . . The September 1 . . . 2018. Looking at page 3, letter K, entertain, travel, and visitation. You see that, sir?

"A.: Yup.

"Q.: Trips and vacations. You list 1750 a month, which is about $21,000 a year. Where did you derive that figure or how did you arrive at that figure?

"A.: For this year or for in general?

"Q.: For inclusion on that affidavit, sir.

"A.: *I try to keep a lot of the vacations and stuff I do from year to year consistent. So I'm sure it's similar to.*

"Q.: When you say vacations from year to year, does that include travel with your sons as well as not with your sons?

"A.: Yes." (Emphasis added.)

[30] As noted, § 46b-86 (a) permits a trial court to modify child support orders in two alternative cases, to wit: upon a showing of a substantial change in circumstances *or* upon a showing that the final order for child support deviates from the guidelines. In the present case, the defendant grounded his motion for modification of child support on a substantial change in circumstances, not a deviation from the child support guidelines.

See footnote 21 of this opinion. At the hearing on the defendant's motion for modification, however, the defendant argued for a modification of his child support obligation because "our child support guidelines are income share models." He did not argue that the 15 percent substantial change provision of § 46b-86 (a) was a factor for the court to consider.

To repeat, the guidelines are relevant only if the movant demonstrates a substantial change in circumstances *or* that the existing child support order substantially deviates from the guidelines, depending on the ground urged in support of modification. See *Mullin* v. *Mullin*, supra, 28 Conn. App. 635–36. In the present case, the defendant grounded his motion for modification of child support on a substantial change in circumstances and failed to demonstrate such a change.

———————————————